## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

LEWIS JONES; and

BRECKEN JONES; and

KJ, a Minor,
BY AND THROUGH PARENTS
LEWIS AND BRECKEN JONES
AS NEXT FRIENDS; and

RJ, a Minor,
BY AND THROUGH PARENTS
LEWIS AND BRECKEN JONES
AS NEXT FRIENDS; and

NJ, a Minor,
BY AND THROUGH PARENTS
LEWIS AND BRECKEN JONES
AS NEXT FRIENDS; and

       **Plaintiffs,**

v.

BOULDER VALLEY SCHOOL DISTRICT RE-2, Boulder, Colorado;

       **Defendant.**

---

## COMPLAINT FOR MONEY DAMAGES

---

## I.     PRELIMINARY ALLEGATIONS

1.     This is a civil rights action under 42 U.S.C. §1983 and the First and Fourteenth

Amendments to the United States Constitution, brought to remedy a violation of constitutional

rights of the Plaintiffs, who were students and parents in Defendant Boulder Valley School District RE-2 ("BVSD").

2.      Superior Elementary School ("SES") is in the Town of Superior, Colorado and is a school within, and under the authority of, Defendant BVSD.

3.      SES is a kindergarten-5th grade school.

4.      Jenn Bedford ("Bedford") was, during the relevant period, the Principal at SES.

5.      As SES principal, Bedford carried out policies, practices, and decisions on behalf of BVSD. Ex. 1, Ex. 2.

6.      This is not a *respondeat superior* case.

7.      On November 16, 2018 Plaintiffs received an email from Bedford that BVSD planned certain transgender programming for November 30, 2018 related to the BVSD health education and human sexuality education. The programming was to include the performance by a transgender choir of a musical called "Raven's True Self."

8.      The musical was to be preceded with three YouTube videos, two of which were planned for showing to kindergarten through fifth grade students, and the third of which was designated for second through fifth grade students. It was not stated in the email on what day(s) the videos would be shown. The email provided internet links to the videos. A classroom lesson led by each classroom teacher on the gender fluidity spectrum and gender roles definitions was to occur the same day.

9.      On November 18, 2018, Plaintiff parents received a second email from Bedford that was apparently in response to negative media coverage generated by her email of November 16, 2018.

10.     Between November 16 and November 19, 2018, Plaintiff parents viewed the videos and noted that they are decidedly intolerant of views such as Plaintiffs' religious views. The videos are replete with negative value judgments of persons with differing opinions to those espoused in the videos. In particular, the videos label opposing views as "mean" and "confused," and they assert that someday people who hold differing views, as do Plaintiffs based on their religion, "will know better."

11.     Based upon their sincerely-held religious beliefs, Plaintiff parents determined to opt their students out of all the transgender programming.

12.     On November 19, 2018, Plaintiff parents sent an email to Bedford explaining their concerns, including that the decision to present transgender programming, as well as the opinions expressed in the programming videos, were intolerant, divisive, and in direct opposition to their religious views.

13.     On November 26, 2018, Bedford responded by email to Plaintiff parents, telling them that they could opt out of only one component of the transgender programming—namely the musical, "Raven's True Self." Ex. 7.

14.     On November 27, 2018, Bedford emailed Plaintiff parents to inform them of an upcoming email to include a link for all parents to opt their children out of the performance of "Raven's True Self." Ex. 7.

15.     While SES provided an online opt-out form for "Raven's True Self." An opt-out was not offered or provided for the objectionable videos. Ex. 8.

16.     On November 27, 2018, Plaintiff parents, in the hope of preserving their and their children's free exercise rights and their right to raise their children as they see fit, filed a formal,

confidential complaint, known as an "AC-E2" complaint, with BVSD pursuant to official BVSD policies. Plaintiffs' complaint was based on religious discrimination. Ex. 4.

17.     On Thursday and Friday, November 29 and 30, 2018, Plaintiff parents kept their SES children home from school because of their religious objection to the material that would be presented both in videos and in the musical.

18.     On Sunday, December 2, Plaintiff parents emailed each of the homeroom teachers of their three SES students to explain their concerns about the transgender programming, to request opt-out for each of their students from any transgender material, to request the immediate segregation of their students in the event that transgender issues arise, and to request immediate notification of such a situation.

19.     On Monday, December 3, 2018, Bedford emailed Plaintiff parents and Cc'd BVSD Assistant Superintendent, Robbyn Fernandez and BVSD general counsel, Melissa Barber in response to the emails that Plaintiff parents sent to the homeroom teachers, saying, "[u]nfortunately, we are not able to accommodate your request to proactively opt-out your students from topics that might be offensive to your religious beliefs."

20.     However, BVSD was already in violation not only of Plaintiffs' First and Fourteenth Amendment rights, but also of BVSD's written policies, including Nondiscrimination, Teaching About Controversial Issues, and Human Sexuality.

21.     Plaintiffs' November 27, 2018 AC-E2 Complaint was unanswered as of January 6, 2019 when they filed an AC-E2 Amended Complaint to address additional issues.

22.     BVSD finally responded long after the BVSD deadline to do so, and to this day, BVSD has failed to answer several of the questions/issues raised in Plaintiffs' AC-E2 Complaint and

Amended Complaint. In short, BVSD has refused to address some of the issues raised in the Complaints.

23.     Plaintiffs' email was forwarded to Bedford, who responded on behalf of BVSD in an email in which she carbon copied BVSD assistant superintendent, Robbyn Fernandez and BVSD general counsel, Melissa Barber. Bedford's response expressly denied Plaintiffs' request to opt their children out of the problematic material on religious grounds, adding that SES would continue to follow various BVSD policies.

24.     On November 27, 2018, Plaintiffs filed a formal, confidential "AC-E2" complaint. Ex. 4.

25.     Plaintiffs were also denied their right to free exercise of religion and the right to the care, control, and upbringing of their children as protected under the First and Fourteenth Amendments and as recognized in various court cases to opt their children out of the problematic programming by steps that BVSD took behind the scenes.[1]

26.     In their AC-E2 complaint, Plaintiffs explained that the BVSD plan to teach sexuality information without a parental exclusion request form as required by the BVSD Rights and Responsibilities Handbook was inappropriate, demonized those whose views differ from the views espoused in the curriculum, and violated their freedom of religion.

27.     The District issued a partial response to Plaintiffs but substantially failed to respond to the items raised in Plaintiffs' complaint and amended complaint.

---

[1] Under U.S.C.A. Const. Amend. 14, providing that no state shall deprive any person of liberty without due process of law, "liberty" denotes, not merely freedom from bodily restraint, but also the right of the individual to contract to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home, and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923).

28.     Plaintiffs notified the Principal of Superior Elementary School, Jenn Bedford ("Bedford") that because of their religious beliefs, they wished to opt their children out of the programming.

29.     Defendant School District policies state that: "Under Colorado law, parents may excuse students from any portion or portions of the School District's comprehensive health education, including human sexuality education." Ex. 1.

30.     Under Defendant School District policies, parents have the right to be informed regarding the content of these units of instruction or courses within the School District's comprehensive health education and to exclude their child from any specific portion or portions of the instruction on the grounds that it is contrary to their religious beliefs and teachings or closely held personal beliefs. Ex. 1 Policy.

31.     Each school is required to send home information regarding the material to be covered and a parental exclusion request form prior to the beginning of instruction.

32.     Defendant SES did not initially send home the required parental exclusion request form but later constructed its form [Ex. 2

33.     The Colorado statutory framework on sex education is called the Colorado Comprehensive Sex Education Act and is codified at C.R.S. §22-1-128 (the "Sex Ed. Act").

34.     Pursuant to the Sex Ed. Act, teaching on gender roles is part of comprehensive human sexuality education. C.R.S. §22-1-128(1)(a)(II), (b)(III), (2)(c),

35.     The District's published materials on health and human sexuality identify gender issues as falling within the opt-out provisions for fifth graders, eighth graders, and high schoolers.  Ex. 1 Policy. The opt-out provisions are substantially in keeping with the Health Ed. Act and the Sex Ed. Act, and they create an expectation for parents in Defendants' school district that they will be

allowed to opt their children out of listed sex and health topics/programming, including for children younger than fifth grade.

36.     Among the topics listed in Exhibit 1 that parents may opt their children out of are: negative influences and myths regarding sexual activity, gender expression and identity, sexual orientation, gender stereotypes, labels and stereotypes regarding gender identity and sexual orientation, healthy relationships, dating, marriage and intimacy.

37.     Despite this fact, Jennifer Bedford, the principal at Superior Elementary School refused to allow the opt-out for the kindergarten through fifth graders, which Plaintiffs, on religious grounds requested, in the interest of their children at Superior Elementary School children.

38.     In denying Plaintiffs' requested opt-outs, Principal Bedford stated by e-mail, "Unfortunately, we are not able to accommodate your request to proactively opt-out your students from topics that might be offensive to your **religious beliefs**. We will continue to follow Board policies, including Nondiscrimination, Teaching About Controversial Issues and Teaching About Religion and Religious Issues in the Schools (specifically section A. Neutrality), and Human Sexuality (each of these documents linked in original)." Ex. 2 Email.

39.     On November 27, 2018, Plaintiffs filed a formal, confidential "AC-E2" complaint with Defendant BVSD. Ex. 4.

40.     On January 6, 2019, Plaintiffs supplemented their AC-E2 complaint with additional material. Ex. 9.

41.     Plaintiffs complaint and supplemental complaint were responded to late and incompletely. This demonstrates the disregard that BVSD maintained for Plaintiffs' primary reason for filing the complaint, which they echoed a number of times throughout: religious discrimination and refusal to allow them to control their children's educations.

42.  Plaintiffs ultimately filed a "KE" appeal of BVSD's denial of their complaint. The BVSD Board of Education refused to even hear their appeal, which amounts to more discrimination.

43.  At the school board meeting where the issue before the Board was whether it would hear Plaintiffs' appeal, the chairperson gave an initial instruction to the large crowd that audible expressions of approval and disapproval of speakers' messages would not be tolerated. In what had become emblematic of BVSD discrimination of Plaintiffs, the BVSD chairperson ignored her own directive to the crowd and allowed attendees to cheer for speakers they liked and to literally hiss at Plaintiffs and other parents who simply asked that the appeal be heard.

## II.       JURISDICTION AND VENUE

44.  This action arises under the United States Constitution, particularly the First and Fourteenth Amendments; and under federal law, particularly 28 U.S.C. § 2201, 42 U.S.C. §§ 1983 and 1988.

45.  This Court is vested with original jurisdiction over these federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

46.  This Court is vested with authority to grant the requested damages by operation of 28 U.S.C. §§ 2201 and 2202, and pursuant to Federal Rule of Civil Procedure 57.

47.  This Court is authorized to issue the requested relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

48.  This Court is authorized to award the requested compensatory damages in an amount to be proven at trial pursuant to 28 U.S.C. § 1343.

49.  This Court is authorized to award attorney fees pursuant to 42 U.S.C. §1988.

50.    Venue is proper in the United States District Court for the District of Colorado Under 28 U.S.C. § 1391(b), in that the events giving rise to the claim occurred within the district.

### III.    IDENTIFICATION OF PLAINTIFFS

51.    Plaintiffs Lewis Jones, Brecken Jones, who are next friends of _____ Jones, _____ Jones, and _____ Jones, are residents of Boulder, Colorado.

52.    Plaintiffs Lewis Jones and Brecken Jones are Christians.

53.    Plaintiffs Lewis Jones and Brecken Jones had three children in Superior Elementary School at the time of the events that give rise to this action.

54.    Pursuant to their sincerely held religious beliefs, Plaintiffs wished to exclude their elementary school children from programming involving themes of human sexuality and gender issues.

55.    The school violated Plaintiffs' religious liberties and Colorado's statutory protections for parents who wish to opt their children out of programming involving themes of human sexuality and gender issues.

56.    Plaintiff parents maintained a practice of reviewing school programming to ensure that they knew what was planned for their children.

### IV.    IDENTIFICATION OF DEFENDANTS

57.    Defendant Boulder Valley School District RE-2, Boulder, Colorado ("BVSD") is a body politic and corporate that may sue and be sued.

58.    The District is organized under the laws of the State of Colorado.

59.    Local governmental units, such as school districts, are considered persons to which 42 U.S.C. 1983 applies.[2]

---

[2] Monell v. Department of Soc. Servs., 436 U.S. 658 (1978).

60.    The District is charged with the administration and operation of Superior Elementary School (SES).

61.    As a governmental entity, BVSD is charged with overseeing the operation of SES and the enactment and enforcement of BVSD policies, both formal and informal, including those related to the constitutional rights of parents to direct the education and upbringing of their children, as well as overseeing compliance with state law by its schools.

62.    BVSD is responsible for its decisions regarding statutory opt-outs, as well as for those of its schools, and for denying Plaintiffs their constitutional and statutory right to opt their elementary children out of programming that violates their religious beliefs.

63.    The District is likewise responsible for the implementation and application of its policies on health education and human sexuality education.

64.    Pursuant to BVSD policies and practice, BVSD has repeatedly and in various ways denied Plaintiffs' fundamental right to direct the education of their children, have denied Plaintiffs the right to exercise their sincerely held religious beliefs, have violated BVSD policy in numerous ways beginning with depriving Plaintiffs of their First Amendment free exercise and Fourteenth Amendment due process rights, including by publicizing Plaintiffs' complaint, and have violated BVSD policies by denying Plaintiffs the right to exclude their children from certain health education programming and human sexuality education programming and by refusing to provide advance information about that programming.

## V.    FACTUAL ALLEGATIONS

**BVSD has a *practice* of discriminating against Plaintiffs' religious beliefs and against their parental rights by violating its own policies regarding health education.**

65.     Although BVSD had official written policies on the presentation of health topics and human sexuality education, its *practice* was to refuse to follow those policies when Plaintiffs (and other parents) indicated a desire to avail themselves of those policies based on their sincerely-held religious beliefs, which are protected under the First Amendment.

66.     Bedford stated in an email on November 19, 2018, "We will continue to follow Board policies, including Nondiscrimination, Teaching About Controversial Issues and Teaching About Religion and Religious Issues in the Schools (specifically section A. Neutrality) and Human Sexuality." But that is exactly what BVSD did not do.

67.     BVSD adopted policy IGAE (4/13/10) on health education. Some of the topics it included are: community and environmental health, consumer health, human growth and development, hereditary and developmental conditions, mental and emotional health, family life education, age appropriate instruction on family roles and expectations, child development, and parenting. Ex. 12 IGAE Health Ed.

68.     Additionally, BVSD adopted policy IGAE-E, which provides that "the goal of health education is to promote physical, intellectual, social, emotional and spiritual well being [sic], not just to prevent disease. A healthy school is one where all students receive consistent messages reinforcing their personal worth, supporting individual and family differences, and emphasizing personal responsibility for health choices." Ex. 15 IGAE-E Health Goals.

69.     IGAE-E echoes IGAE (Ex. 12): "Parents/guardians of all students shall be notified in writing prior to student's involvement in a health education course of instruction. The notice to parents/guardians informs the parents that they may exclude their child from a

specific portion or portions of the instruction on the grounds that it is contrary to the religious beliefs and teachings... ." Ex. 15 IGAE-E Health Goals.

70.     IGAE-E also provides: "Upon request, each school shall give parents/guardians an opportunity to review the materials to be used and participate in a conference with the instructor and principal in order to assist the parent/guardian in determining whether to request an exemption for the student from a specific portion of the planned instruction." Ex. 15 IGAE-E Health Goals.

71.     BVSD produces a form called "Exclusion from Human Sexuality Curriculum" (the "Exclusion Form"). The Exclusion Form begins by explaining that under Colorado law, (parents) may exclude their children from any portion(s) of the BVSD sex ed. curriculum. It goes on to state that parents may exclude their children from any aspect of the health curriculum (even if it does not involve sex ed.) on the grounds that the instruction is contrary to your child's or your religious...beliefs. Ex. 16 Exclusion Form.

72.      The "Exclusion Form" sets forth what topics covered in Health Education qualify as sexual health issues. Among those are:

Anatomy of male and female reproductive systems;

Biology of conception to birth

Puberty - normal human variance

Personal hygiene practices and health and safety;

 Ex. 16 Exclusion Form.

73.     The sexual health issues certainly pertain to transgender students.

74.     The Health Topics

75.     According to the 2018-2019 BVSD Rights and Responsibilities Handbook (the

        "Handbook"), policy IGAE recognizes that both state statute and policies of BVSD

        protect the rights of parents of Kindergarten-8[th] graders to make important decisions

        about their child's education regarding health, human growth and development and

        human sexuality. Furthermore, the Handbook affirms parents' right to be informed and to

        exclude their students from *any* specific portion or portions of the instruction for religious

        reasons.[3] Ex. 12 Handbook at 14.

76.     The Handbook further provides that "[e]ach school will send home information regarding

        the material to be covered and a parental exclusion request form prior to the beginning of

        instruction." Ex. 12 Handbook at 14.

77.     The Handbook recognizes the same rights for parents of high schoolers. [*Id.*]

78.     In view of the BVSD Handbook's reliance on state statute for compliance, it is

        appropriate to review the protections of Colo. Rev. Stat. § 22-25-106 the Health

        Education Act (the "Health Act") in determining whether BVSD complied with its own

        stated policies.

79.     Each local comprehensive health education program which is adopted by a school district

        or board of cooperative services is bound by the Health Act.

80.     Moreover, BVSD has adopted a local comprehensive health education program, and in its

        Handbook it has affirmatively constrained itself to abide by the Health Act.  Ex. 12

        Handbook at 14.

---

[3] "Parents have the right to be informed regarding the content of these units of instruction or courses and to exclude their child from any specific portion or portions of the instruction on the grounds that it is contrary to their religious beliefs and teachings... ." Handbook at 14.

81. Under the Health Act, parents have the right to exempt their children from a specific portion of the program on the grounds that it is contrary to the religious beliefs and teachings of the student or the student's parent or guardian. Colo. Rev. Stat. §22-25-106.

82. Under the Health Act, "The curriculum and materials to be used shall be made available for public inspection at reasonable times and reasonable hours and a public forum to receive public comment upon such curriculum and materials shall be held. Colo. Rev. Stat. §22-25-106.

83. BVSD transgender programming as contemplated in Queer Kid Stuff Videos and in the musical, "Raven's True Self" falls under BVSD health education policy IGAE.

84. BVSD representatives, such as Bedford asserted on various occasions that the transgender programming was for the benefit of transgender students and their acceptance in the SES community. Taking this to be true, the transgender programming certainly fell within the BVSD IGAE policy framework in that it ostensibly addressed community and environmental health, human growth and development, hereditary and developmental conditions, mental and emotional health, family life education, age appropriate instruction on family roles and expectations, child development, and parenting.

**By presenting gender identity lessons to kindergarten through fifth graders, by not offering opt-outs for all such material, and by avoiding designation of gender identity lessons as sex ed., BVSD has a practice of violating its own policies regarding sex education and, thereby engaging in religious and parental rights discrimination against Plaintiffs.**

85.     The District has an official written policy of informing parents that they may opt their children out of certain lessons on human sexuality. Ex. 12, 14.

86.     Moreover, "human sexuality shall be a part of the health education curriculum." Ex. 12.

87.     Referring to District Policy IGAI (04/13/10), the Handbook states, "Instruction in human sexuality includes information dealing with the growth and development of the human body, human sexuality, and reproduction. Instruction is provided for every student in grades 5-8 and 10-12. The policy and regulation of human sexuality instruction outlines specific topics and guidelines for teachers and acknowledges the rights of parents." Ex. 12 Handbook at 14.

88.     Parental notification and exclusion from within the human growth and development/human sexuality portion of the curriculum is accomplished by use of the health education program Parental Exclusion Request form (IGAE-E or IGAE-E2). Ex. 20.

89.     BVSD violated its own policy that "[o]nly District trained and approved staff shall teach the human sexuality curriculum." And "Community-based speakers may be used to enhance the health education curriculum by presenting timely and appropriate information on topics being covered in the learning materials. Such speakers must be approved by the health education coordinator and will be listed in the health teachers' resource guide." Ex. 20.

90.     Plaintiffs found no evidence that this policy was followed. It appears that, like so many other BVSD policies, it was disregarded in favor of BVSD's practice of using its policies as façades behind which it could impose its true desires while running roughshod over Plaintiffs' civil rights.

15

91.    Although this case is not about Colorado law, in assessing whether the gender

programming that gives rise to this action is covered by the state statute on human

sexuality education (the "Sex Ed. Act") as it existed in 2018, it is instructive to consider

whether gender issues fall under the designation of sex ed.

92.    The Sex Ed. Act provides that

The general assembly hereby finds and declares that:

(I)    "Colorado youth have a right to receive medically and scientifically accurate

information to empower them to make the informed decisions that promote their

individual physical and mental health and well-being;

(II)    This right applies to all youth regardless of...sexual orientation or gender

expression;"

Colo. Rev. Stat. §22-1-128(1)(a)(II)

93.    The Sex Ed. Act is instructive in that it provides that gender and transgender issues are an

integral component of sex education:

(III) The provisions of sexual and reproductive health education that incorporate

comprehensive, evidence-based, culturally sensitive, and age-appropriate standards can

result in youth delaying sexual activity until they are ready, avoiding unwanted

consequences of sexual behavior, learning medically accurate information about their

health, and promoting positive youth-friendly messages concerning growth, development,

body image, gender roles, and all aspects related to healthy, safe relationships and sexual

behavior.

Colo. Rev. Stat. Ann. § 22-1-128(1)(b)(III)

94.     Under the Sex Ed. Act, "'Culturally sensitive' means the integration of knowledge about individuals and groups of people into specific standards, requirements, policies, practices, and attitudes used to increase the quality of services. "Culturally sensitive" includes resources, references, and information that are meaningful to the experiences and needs of communities of color; immigrant communities; lesbian, gay, bisexual, and transgender communities; people who are intersex; people with physical or intellectual disabilities; people who have experienced sexual victimization; and others whose experiences have traditionally been left out of sexual health education, programs, and policies."

Colo. Rev. Stat. § 22-1-128(2)(c)

In other words, from a legal standpoint, study of transgender communities and related matters is squarely in the category of human sexuality education.

95.     Board member Richard Garcia concurs, saying in an email that state law requires sex ed. to be taught in a LGBTQ, gender inclusive way and that parents have "every right" to opt their children out of sex ed. if they wish. Ex. 18.

96.     In spite of the guidance of BVSD written policies and state law on point, BVSD engaged in a surreptitious campaign to subvert Plaintiffs' religious rights and rights to raise their children according to their conscience. In February 2019 a regular electronic BVSD publication to teachers instructed:

"We encourage you to intentionally weave one of the following equity-centered BLM guiding principles into your everyday teaching practice or an upcoming lesson:

- Restorative Justice

- Empathy

- Diversity

- Globalism

- Transgender Affirming

- Queer Affirming

- Intergenerational

- Black Families

Engaging your students and families in these honest conversations will spark critical reflection and ultimately leads to systemic change on educational issues that impact social justice." Ex. 5.

97. This email informed Plaintiffs that their struggle was even bigger than they previously understood. Indeed, they were facing not only a school district that had abandoned its written policies and aligned itself with AQE, an organization that portrays Plaintiffs and those like them as hateful, judgmental, and intolerant, but they were also up against the Black Lives Matter organization, which has produced a great deal of LGBTQIA+ materials and made it available to school districts and others online.[4]

98. The message violates not only the written BVSD sex ed. policies but reveals that BVSD has created a climate and method of instruction that is designed to elude detection and opt-out requirements. For, if the principles described are woven into the fabric of students' learning, the principles might not be so easy to spot as material presented at assemblies. If it is difficult to spot, it will difficult for parents to opt their children out, which is clearly the BVSD unwritten goal.

---

[4] https://neaedjustice.org/supporting-lgbtq-youth/ (accessed 11-16-20)

99.     This is just one more way that BVSD, through efforts that violate its own written
        policies, undercuts families whose religious beliefs are not the same as the beliefs of
        BVSD.

100.    In an email on April 9, 2019, Bedford  told Plaintiffs, ""The only opt out opportunities
        that will be available are for the instructional events described in Ms. Fernandez's
        determination.  No other opt out opportunities are available unless otherwise provided in
        District policy."  -Jennifer Bedford, CC Robbyn Fernandez 4/9/19.

101.    This informed Plaintiffs that their concerns were still not being addressed per BVSD
        written policies and confirmed yet again that the religious discrimination that they had
        encountered six months earlier was far from over.

102.    Because BVSD policies indicate that gender issues are included in the sex ed. curriculum
        (Ex. 16 Exclusion Form) and because BVSD policies point to state statute as governing
        its sex ed. policies (Ex. 12 at 14.), and because the Sex Ed. Act makes it clear that gender
        and gender expression issues are a necessary component of sex ed., there can be no doubt
        that when BVSD presents programming involving gender and gender expression, it is a
        matter of sex ed.

103.    All matters of sex ed. are also matters of health ed. because of how BVSD categorizes
        sex ed. Ex. 12 at pg. 14, Ex. 14.

104.    BVSD teachers who present sex ed. information are required to "consult with the
        building principal for such training. To be an approved instructor for human sexuality, a
        teacher will be required to complete the District directed in-service training." [Ex. 20.]

105.    Plaintiffs have no evidence that any of their children's teachers were approved instructors
        for human sexuality as of November 2018.

106.    Notably, Ex. 14 suggests that sexuality education is not available to students below 5th

grade. However, Ex. 12 makes clear that parents have the right to exclude their children

from health education, including sex education, beginning with their kindergarteners.

107.    BVSD provided an opt-out form for "Raven's True Self." Ex. 8, Ex. 17.

108.    Nevertheless, BVSD, in spite of its policies (including those indicating governance by

Colorado law) and in spite of having effectively admitted that transgender programming

constitutes sexuality education by providing the opt-out form for the performance of

"Raven's True Self", BVSD has repeatedly denied that gender and transgender issues are

properly a part of its sex ed. curricula and that such curricula can be opted out of. [Ex. 1,

Ex. 2.]

**BVSD has a *practice* of religious discrimination against Plaintiffs in handling the dispute and Plaintiffs' formal complaints.**

109.    Plaintiffs are deeply religious, and they conduct themselves according to their religious

beliefs.

110.    Among Plaintiffs' religious beliefs is that all people should be treated as having

inestimable worth because they are created in the image and likeness of a loving God

who sent His only Son to die for the sins of all people, equally. This belief governs

Plaintiffs' interactions and demands that everyone be treated with honor and respect.

111.    Bedford's email indicating a transgender performance and related videos to be shown in

conjunction with said performance violated Plaintiff's religious freedom as recognized in

the First Amendment of the United States Constitution because it informed elementary

school parents of sex ed. events for which there was no opt-out even though an opt-out

was required. Ex. 1, Ex. 2.

112.   Plaintiffs, almost immediately upon learning of the planned Queer Kid Stuff videos and the planned presentation of "Raven's True Self", emailed Bedford to voice their concerns.

113.   Bedford initially responded that no opt-out would be allowed, but she later begrudgingly provided one for only "Raven's True Self" but not for the videos or classroom discussions.

114.   BVSD Chief Communication Officer, Randy Barber explained, "As a part of our commitment to diversity, BVSD has long allowed families to work with their schools and opt out of certain instructional events on a variety of topics. Instructional events are planned lessons, assemblies and/or guest speakers, with reference to content that families may wish to opt out of. It is not our expectation that families or students are able to opt out of spontaneous classroom discussions, including student expression or teachers responding to student questions. Schools are expected to specifically communicate with families in advance about assemblies and guest speakers." This approach is deceptive in that it purports to offer an opt-out unless something spontaneous occurs in the classroom, but what it really does is make room for unannounced classroom discussion of matters that are governed by BVSD health and sex ed. curricula.

115.   District Policies AC (Nondiscrimination/Equal Opportunity) 10/23/12, JB (Equal Educational Opportunities) 01/22/19, and JBB (Sexual Harassment), 10/23/12

116.   The Board of Education is committed to providing a safe learning and work environment where all members of the school community are treated with dignity and respect. No otherwise qualified student shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination or harassment under any district program or activity

on the basis of disability, race, creed, color, sex (which includes marital status), sexual orientation, gender identity/expression, national origin, religion, ancestry, need for special education services or physical characteristics.

117.   Any student who believes he or she has been a victim of unlawful discrimination or harassment as defined in Board policy, or who has witnessed such unlawful discrimination or harassment, is encouraged to immediately report it to an administrator, counselor, teacher or the district's compliance officer and file a complaint as set forth in BVSD Regulation AC-R.

118.   "[n]o student shall be subject to adverse treatment in retaliation for any good faith report of discrimination or harassment." *Id*.

**BVSD engaged in religious discrimination by presenting sex ed. materials to K-5th students, engaging in educational partnerships, and avoiding its own written policies in ways that harmed Plaintiffs because of Plaintiffs' religious beliefs.**

119.   BVSD policy provides for "resource personnel" to oversee the sex ed. curriculum. Policy IGAI-R, "Resource personnel shall not advocate the use of specific community agencies nor special interest groups." Ex. 20. Presumably, this is so that special interest groups cannot commandeer BVSD sex ed. policy.

120.   However, BVSD partners with, and even sponsors, LGBTQIA+ special interest group, A Queer Endeavor ("AQE"). Ex. 21.

121.   AQE operates out of the School of Education at CU-Boulder. They focus on training teachers and teachers-to-be to "queer the classroom."

122.   BVSD has worked with AQE since about 2013. According to the CU Boulder website, as of November 23, 2015, AQE visited 11 BVSD schools and, in the fall of that year,

provided three professional development sessions (2.5 hours each) with all Boulder Valley School District principals. AQE was contracted to provide a three-part Teacher Institute Series offered to all BVSD teachers during the 2015-2016 school year. Ex. 21.

## RETALIATION

**BVSD engaged in discriminatory retaliation on the basis of Plaintiffs sincerely held religious beliefs by disclosing sensitive student information in violation of FERPA and District Policies and by refusing to fully address Plaintiffs' complaint and supplemental complaint.**

123.   BVSD policy is that AC-E2 complaints are to remain confidential.

124.   Plaintiffs' AC-E2 complaint contained information about Plaintiff minor students.

125.   BVSD handbook provides that "[t]he staff and administrators of BVSD safeguard the educational records of students in accordance with the requirements of federal and state laws, and consistent with district policy." [Ex. 12 at 13, 14.]

126.   However, after the Boulder Daily Camera published a story about the parent concerns regarding the transgender programming at SES and included information that Plaintiffs had shared only in their AC-E2 complaint and which could allow readers to connect the information to Plaintiffs, including Plaintiff minors, Plaintiff parents spoke with the journalist who published the story and learned that Randy Barber, BVSD's Chief Communication Officer had simply provided a copy of Plaintiffs' AC-E2 complaint to her without so much as an open records request.

127.   BVSD policy states that "[n]o student shall be subject to adverse treatment in retaliation for any good faith report of discrimination or harassment." Ex. 12.

128.   Yet, the climate at SES became decidedly caustic for the families who opposed BVSD's transgender curricular endeavors.

129.   BVSD teachers were overheard at school openly maligning the families who complained about the SES transgender materials in November 2018.

130.   BVSD teachers and community members posted hostile messages online, including on the BVSD safe schools facebook page. What gets posted online can get back to children and harm them. That the lack of acceptance can be damaging to young people is a central concept forwarded by BVSD and AQE. Yet, BVSD did not hesitate to retaliate against Plaintiffs when given the opportunity to do so.

131.   On April 22, 2019, the BVSD Safe Schools Initiative even posted a message on its facebook page pointedly calling for LGBTQ supporters to show up at the school board meeting the following night to oppose Plaintiffs, who it acknowledged had filed a religious discrimination complaint against BVSD. The post mischaracterized Plaintiffs' complaint as anti-LGBTQIA+ students and falsely stated that Plaintiffs had leveled an attack on them. It is quite possible that the story in the Boulder Daily Camera is what inflamed the person who posted this on the BVSD SSI facebook page. Ex. 23.

132.   As if the retaliation of releasing personal, confidential information and stirring up a crowd to oppose Plaintiffs at a school board meeting was not enough, Rob Anderson and Robbyn Fernandez refused to answer Plaintiffs' complaint in a timely way and refused to answer certain issues raised.  In fact, Rob Anderson, the BVSD superintendent and the compliance officer, failed to answer the central issues raised in the discrimination complaint. This could not have been an accident.

133.   Plaintiffs made numerous requests for timely and complete responses to their religious discrimination complaint. Ex. 11.

134.   BVSD appears to have realized that Plaintiffs were right about their concerns and decided to play games with Plaintiffs rather than respond substantively and meaningfully to their requests and concerns set forth in their discrimination complaint.

135.   Throughout their initial emails and in their complaint and supplemental complaint, Plaintiffs repeatedly indicate that their complaints are based on their religious freedom and their faith. Still, Superintendent, Rob Anderson and Assistant Superintendent, Robbyn Fernandez state in emails that Plaintiffs complaints are not about religious discrimination. Ex. 11, Ex. 25.

136.   Because of the great mistreatment and systematic alienation of Plaintiffs by BVSD, Plaintiffs cannot return to Boulder Valley Schools.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of First Amendment Freedom of Religion

137.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

138.   The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiffs' rights to free exercise of religion.

139.   Plaintiffs have sincerely held religious beliefs that govern their conduct and views.

140.   Plaintiffs religious views are sincerely held and do not inhibit the freedoms of others.

141.   The practice of Defendant BVSD of abandoning its written policies whenever it sees fit and with disregard, if not in view of Plaintiffs' religious beliefs violates Plaintiffs' First Amend right to practice their religion and to be free from government impingement of their religion.

142. Defendant BVSD's unwritten practices of abandoning its written policies at its own convenience do not constitute neutral laws of general applicability. Rather, they are decidedly non-neutral, clearly favoring those with a particular view of sexuality and gender and decidedly disfavoring Plaintiffs.

143. BVSD lacks a compelling, legitimate, or rational interest in its pattern of willfully ignoring its written policies which, presumably, exist to maintain the rule of law and of the civil rights of the families it exists to serve.

144. The BVSD practice of abandoning its official policies burdens Plaintiffs' sincerely held religious beliefs while at the same time setting up a pervasive system of individualized preference for those who do not hold religious views similar to those of Plaintiffs.

145. BVSD's actions in this regard have caused, are causing, and will continue to cause Plaintiffs financial hardship as Plaintiffs have had to pull their children out of BVSD and engage in a combination of home educating and private schooling at great personal financial expense, the amount of which will be proved at trial.

146. Plaintiffs pray for relief against BVSD as hereinafter set forth in their prayer for relief.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Violation of Fourteenth Amendment Right to Direct the Care and Upbringing of Children**

147. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

148. BVSD's pattern and practice of avoiding compliance with its written policies deprived Plaintiff parents of their right to the care, control, and upbringing of their children as recognized by court decisions pursuant to the First and Fourteenth Amendments of the U.S. Constitution.

149.    The denial of a parent's ability to make fundamental decisions regarding her child's education rises to the level of a constitutional violation.[5]

150.    The Due Process Clause of the Fourteenth Amendment guarantees heightened protection against government interference with certain fundamental rights and liberty interests, including the right of parents to direct their children's upbringing.

151.    Defendant BVSD interfered directly with Plaintiff parents' rights in this regard and then refused to remedy the interference in the course of the administrative remedy process in which Plaintiffs, but not Defendant BVSD, engaged fully.

152.    BVSD's actions in this regard caused Plaintiffs emotional difficulty and financial hardship during and after the period of the 2018-2019 school year as Plaintiff parents had to pull their children out of BVSD schools and engage in a combination of home educating and private schooling at great personal financial expense, the amount of which will be proved at trial.

153.    Plaintiff children, meanwhile, suffer greatly because of this deprivation and have lost countless friends in the process.

154.    Plaintiffs pray for relief against BVSD as hereinafter set forth in their prayer for relief.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Violation of Fourteenth Amendment Equal Protection**

155.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

---

[5] *See Meadows v. Lake Travis Indep. Sch. Dist.*, 397 Fed.Appx. 1, 3 (5th Cir.2010) (unpublished) (per curiam), quoted in Doe v. Dallas Indep. Sch. Dist., 194 F. Supp. 3d 551, 561 (N.D. Tex. 2016).

156.    The BVSD transgender programming and curricula deny equal protection to parents who, for religious or other reasons, wish to exclude their children from the teachings.

157.    Equal Protection Doctrine requires that similarly situated persons be treated similarly. However, religious parents in the District who wish to exclude their children from the problematic programming are not treated like non-religious parents.

158.

159.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to equal protection under the law.

160.    BVSD has abused its policies, and thereby Plaintiffs, through a systematic mechanism by which it favors some parents because of their beliefs while disfavoring others because of their beliefs.

161.    BVSD's actions in this regard caused Plaintiffs emotional difficulty and financial hardship during and after the period of the 2018-2019 school year as Plaintiff parents had to pull their children out of BVSD schools and engage in a combination of home educating and private schooling at great personal financial expense, the amount of which will be proved at trial.

162.    Plaintiff children, meanwhile, suffer greatly because of this deprivation and have lost countless friends in the process.

163.    Plaintiffs pray for relief against BVSD as hereinafter set forth in their prayer for relief.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Retaliation in Violation of Religious Liberty**

164.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

165. By filing a formal complaint in close adherence to BVSD policies and procedures, Plaintiffs were engaged in free speech and petitioning the government for a redress of grievances. Plaintiffs' activities in this regard are constitutionally protected.

166. BVSD's adverse action in violating BVSD policies regarding the AC-E2 complaint process caused Plaintiffs to suffer injuries. It caused Plaintiffs relational difficulties and difficulties navigating what is otherwise a straightforward complaint process.

167. Plaintiffs had to repeatedly ask for responses to their complaints, and they never got those responses.

168. BVSD's actions in this regard were intended and carried out in retaliation against Plaintiffs, whom it regards as hateful, uncaring, and anti-certain students.

169. BVSD's actions resulted in Plaintiff children being pulled out of their neighborhood school permanently and losing many valued relationships both to students and teachers.

170. Plaintiffs pray for relief against BVSD as hereinafter set forth in their prayer for relief.

## PRAYER FOR RELIEF

171. Plaintiffs pray for monetary damages in compensation for the expenses incurred in home educating their children up to a certain grade level and private educating their children after that grade level through high school, all of whom would attend BVSD schools were it not for BVSD's actions in violation of their constitutional rights.

172. Plaintiffs pray for attorney fees and costs as set forth in 42 U.S.C. §1988, and for such other and further relief that the Court deems just and proper.

[Attorney listed on following page.]

ILLUMINE LEGAL, LLC
/s/ *J. Brad Bergford*
J. Brad Bergford, CO Bar no. 42942
Attorney at Law
7887 E. Belleview Avenue, Suite 1100
Denver, CO 80111
Phone: 303.228.2241
Email: brad@lawillumine.com
Attorney for Plaintiffs