## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  20-cv-03399-RM-NRN

**LEWIS JONES**; and **BRECKEN JONES**; and **KJ**, a Minor,
BY AND THROUGH PARENTS LEWIS AND BRECKEN JONES
AS NEXT FRIENDS; and **RJ**, a Minor, BY AND THROUGH
PARENTS LEWIS AND BRECKEN JONES AS NEXT FRIENDS;
and **NJ**, a Minor, BY AND THROUGH PARENTS LEWIS AND
BRECKEN JONES AS NEXT FRIENDS; and

Plaintiffs**,**

v.

**BOULDER VALLEY SCHOOL DISTRICT RE-2**, Boulder, Colorado;

Defendant.

---

### MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

---

Plaintiffs allege that Boulder Valley School District (BVSD) staff violated their constitutional rights by not allowing them to proactively opt out of any "transgender programming" at their children's school. Even accepting Plaintiffs' factual allegations as true, as is required on a motion to dismiss, Plaintiffs have not plausibly alleged municipal liability under *Monell* or that staff violated their constitutional rights. The Court should dismiss the amended complaint for failure to state a claim upon which relief can be granted under F.R.C.P. 12(b)(6).

### CONFERRAL CERTIFICATION

This Court's practice standards discourage dismissal motions where a defect in the pleading can be corrected by amendment. Undersigned counsel conferred with counsel for Plaintiff

by email and phone to discuss aspects of the amended complaint (ECF 13) that could be the subject of a motion to dismiss pursuant to Fed. R. Civ. P. 12. Plaintiffs have opted not to amend their complaint further, and they oppose this Motion.

## STANDARD FOR MOTION TO DISMISS

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate where, as here, a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Courts review the sufficiency of the complaint by presuming all alleged facts are true, construing them in a light favorable to plaintiff. *Hall v. Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991). To survive a motion to dismiss federal claims, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A pleading that offers labels and conclusions, a formulaic recitation of the elements, or naked assertions devoid of factual enhancement is not sufficient to survive a motion to dismiss. *Id.* Allegations must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In the context of Section 1983 litigation, the complaint must "make clear exactly *who* is alleged to have done *what* to *whom*." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (emphasis in original).

## RELEVANT ALLEGATIONS[1]

Plaintiffs Lewis and Brecken Jones live in Boulder County with their three children, KJ, RJ, and NJ. (ECF 13 ¶¶ 61.) The children previously attended school in BVSD at Superior

---

[1] The School District accepts the factual allegations in ECF 13 as true for purposes of this motion only. The District does not accept the many "legal conclusion[s] couched as [] factual allegations" in the complaint, which this Court is not bound to accept either. *Twombly*, 550 U.S. at 555.

Elementary School, which serves students in Kindergarten through Fifth Grade. (*Id.* ¶ 2-3, 63.) Plaintiffs identify as Christians. (*Id.* ¶ 62.)

On November 16, 2018, the principal of Superior Elementary, Jenn Bedford, emailed Plaintiffs and other school families a "save the date" for an upcoming musical performance called "Raven's True Self." (ECF 13 ¶ 7; Ex. 1 to ECF 13.) Ms. Bedford described the musical as being "about a transgender raven in a community of animals and the importance of friendship and being seen for who you are on the inside, rather than what you look like on the outside." (Ex. 1 to ECF 13 at 1.)[2] The musical would be performed on November 30, 2018 by a community group called "Phoenix, Colorado's Transgender Community Choir." (*Id.* at 1-2.) All school students and their families were invited to attend. (*Id.* at 2.) Ms. Bedford also said that teachers would show three videos before the performance, and she included links to those videos. (*Id.* at 2-3.)

Two days later, Ms. Bedford sent out another email about the upcoming musical, this time in response to media coverage and parent concerns about the performance. (ECF 13 ¶ 9; Ex. 26 to ECF 13.) Ms. Bedford stated that "the goal of bringing the play to [the school] was to encourage inclusivity and acceptance," but she recognized that "this can be a sensitive topic for some families," which "is why I included the information in our [November 16] newsletter" so that parents could "reach out to ask questions, and ultimately, opt their children out of the assembly, if they wish." (Ex. 26 to ECF 13.) Ms. Bedford clarified that she had, before agreeing to the

---

[2] District courts may consider documents referenced in the complaint without converting a motion to dismiss to one for summary judgment if the documents are central to the plaintiff's claims and there is no dispute as to their authenticity. *Waller v. City and Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019). The documents cited in this motion are central to Plaintiffs' claims—indeed, they are attached to the complaint—and there is not dispute as to their authenticity.

performance, reviewed the materials to ensure that they were appropriate for students. (*Id.*) Ms. Bedford closed by stating, "Again, I welcome those with further questions to reach out to me. If you wish to opt your child out of [the] November 30[] performance, reply to this email and we will happily make alternative arrangements." (*Id.*)

Plaintiffs viewed the videos, determined the videos were intolerant of their religious views, and decided to opt their children out of the "transgender programing." (ECF 13 ¶ 10.)

On November 19, Plaintiffs emailed Ms. Bedford expressing their concerns with the videos and the planned musical. (ECF 13 ¶ 12; 11/19/18 Jones Email to Bedford, **Ex. A** hereto.)[3] Ms. Bedford responded on November 26, stating that she appreciated their feedback but ultimately felt that the musical's "message of inclusivity and acceptance are important" and "it is important that all of our students feel that they are part of our community." (ECF 13 ¶ 13; Exs. 7 & 19 to ECF 13.) Ms. Bedford also noted that it is District policy to support students and staff who are transgender or gender non-conforming. (Exs. 19 & 22 to ECF 13.)

Around this time, Plaintiffs learned that "classroom discussions were planned" where teachers would reinforce the messages of the videos and the play. (ECF 13 ¶ 14.) On November 27, 2018, Plaintiffs filed a complaint with BVSD claiming religious discrimination. (ECF 13 ¶ 17; Ex. 4 to ECF 13.) Plaintiffs alleged that the school was planning to teach "sexuality information" that was intolerant of Plaintiffs' religious views without allowing them and other "religious" families to opt out of such programming. (*Id.*) They alleged this violated District policies. (*Id.*)

---

[3] The documents attached as exhibits to this motion are documents cited in, but not attached as exhibits to, the complaint. There is no dispute as to their authenticity. Thus, they may be considered with this motion without converting it to a summary-judgment motion. *Waller*, 932 F.3d at 1282.

The next day, Plaintiffs conferred over the phone with BVSD Assistant Superintendent Robbyn Fernandez concerning the issues raised in their complaint. (Ex. 24 to ECF 13.)

Several days before the play, the District gave Plaintiffs an opt-out form. (*Id.* ¶ 15-16, 123; Ex. 8 to ECF 13.) Plaintiffs opted their children out of the play and kept them home from school on November 29 and 30 given their objection to the videos and the musical. (ECF 13 ¶¶ 18.)

On Sunday, December 2, 2018, Plaintiffs emailed each of their child's homeroom teacher explaining their concerns about the "transgender programing" and requesting that they be allowed, proactively, to opt their children out of "any transgender material," immediately segregate the children whenever "transgender issues arise," and notify Plaintiffs immediately "of such a situation." (ECF 13 ¶ 20; Ex. 2 to ECF 13 at 1-2.) Plaintiffs also asserted that not allowing such accommodations would violate District policy. (Ex. 2 to ECF 13 at 1-2.)

The next day, Ms. Bedford emailed Plaintiffs in response to their emails to the homeroom teachers, stating: "Unfortunately, we are not able to accommodate your request to proactively opt-out your students from topics that might be offensive to your religious beliefs." (ECF 13 ¶ 20; Ex. 2 to ECF 13 at 1.) Ms. Bedford said that if Plaintiffs "would like more information about the planned curriculum, I am happy to facilitate a meeting." (*Id.*) Ms. Bedford copied District counsel and Ms. Fernandez on her email. (*Id.*)

On January 6, 2019, Plaintiffs amended their discrimination complaint stating, among other things, that the District was violating state law, creating a "hostile environment" for families of faith, and engaging groups like A Queer Endeavor and Black Lives Matter to inject activist political agendas into the schools' curriculum. (Ex. 4 to ECF 13 at 2-5.)

On February 21, 2018, Ms. Fernandez issued written findings in response to Plaintiffs' complaints. (ECF 13 ¶ 28; Findings, **Ex. B** hereto.) In her findings, Ms. Fernandez concluded that staff had not violated any District policy or law. (Id.) But she instructed that, moving forward, the principal of Superior Elementary must, at least one week before an "instructional event" at which gender identity will be discussed, send a stand-alone email to all families informing them of the instructional event, any guest speakers who may be involved, and including a link to an opt-out form so that alternative activities can be arranged for children opting out. (*Id.* at 3.)

The next day, BVSD sent a "Instructional Services and Equity" newsletter to all teachers. (ECF 13 ¶ 112; Ex. 5 to ECF 13 at 2.) One portion of this newsletter, called "Tips and Classroom Resources – Tip from Family Partnerships," states:

> "Be a part of the amazing work that is going on around the country to transform education by infusing your work with a greater awareness of your students' and families backgrounds. This week, we're sharing the Black Lives Matter curriculum and toolkit for teachers" and "encourage you to intentionally weave one of the following equity-centered BLM guiding principles into your everyday teaching practice or an upcoming lesson: restorative justice, empathy, diversity, globalism, *transgender affirming*, *queer affirming*, intergenerational, black families."

(*Id.* (emphasis added).) The tip further states: "Engaging your students and families in these honest conversations will spark critical reflection and ultimately lead[] to systemic change on educational issues that impact social justice." (*Id.*)

When Plaintiffs saw this posting, they believed "their struggle was even bigger than they had previously understood." (ECF 13 ¶ 113.) Plaintiffs perceived that "they were facing not only a school district that had abandoned its written policies and aligned itself with A Queer Endeavor, an organization that portrays Plaintiffs and those like them as hateful, judgmental, and intolerant,

but they were also up against the Black Lives Matter organization . . ., which has produced a great deal of LGBTQIA+ materials and made it available to [districts] and others online." (*Id.*)

Ms. Fernandez issued supplemental findings on March 22, 2018 providing "further detail in support of my finding that school staff did not violate applicable law or District policy." (Ex. 25 to ECF 13.) Ms. Fernandez noted that, despite keeping their children at home during the assembly, Plaintiffs "voluntarily attended the assembly without [their] children and viewed the video at 9:30am prior to the assembly," and that "[their] children were not penalized [for] not attending school on November 29 and 30." (*Id.* at 2.)

On April 9, 2018, Ms. Bedford emailed Plaintiffs, stating that, while they could opt their children out of "instructional events" as Ms. Fernandez had stated, "the school will not remove age-appropriate materials that address or discuss gender identity" and is "not able to opt students out of day-to-day discussions regarding gender that may arise organically in an elementary school classroom setting." (ECF 13 ¶ 117; 4/9/19 Bedford Email to Jones, **Ex. C**.)

Plaintiffs appealed the District's decision to the BVSD Board of Education, which scheduled to hear the issue at a public meeting on April 23, 2018. (ECF 13 ¶ 44-45.)

On April 22, the *Boulder Daily Camera* published an article and one "staff editorial" about parent concerns regarding transgender programming at the school. (*Id.* ¶ 148.) The article included "confidential" information that Plaintiffs had included in their complaint. (*Id.*) Plaintiffs learned that the District's Chief Communications Office, Randy Barber, had "provided a copy of Plaintiffs' complaint to [the author of the article] without so much as an open records request." (*Id.* ¶ 148.)

Also that day, a group called "The Boulder Valley Safe Schools Coalition" posted online encouraging people to attend the BVSD Board of Education meeting the next day concerning

"anti-LGBTQIA+ parents from Superior" and expressing disapproval of what the group perceived to be an effort by the District to accommodate these parents. (Ex. 25 to ECF 13.)

The next day, the District Board of Education voted in open session to not consider Plaintiffs' appeal. (ECF 13 ¶ 44.) At this meeting, the Board permitted "audible expressions of disapproval" of Plaintiffs and those sharing their viewpoints. (*Id.* ¶¶ 45-46, 52.) Certain people attending the meeting carried signs that Plaintiffs found objectionable, including signs stating, "No place for hate in BVSD" and "Safe schools for all children" and those indicating that there may be "some LGBTQ teachers in BVSD." (*Id.* ¶¶ 46-47; Ex. 30 to ECF 13.) One person was photographed with a shirt stating, "Protect Trans Kids" with images of a knife and a rose (Ex. 29 to ECF 13), which Plaintiffs took as promoting violence to protect transgender children. (ECF 13 ¶ 48.) The Board did not ask that these signs or this t-shirt be covered up. (*Id.* ¶ 49.) District Superintendent Rob Anderson stated at the meeting that BVSD "has long been a leader in the support and celebration of diversity," that "[w]e are nationally known for our practices and policies that support our LGBTQ community," that "BVSD stands firm behind our transgender students," that "[w]e are proud of our policies and practices that make our transgender students feel welcome and safe," and that "BVSD has a history of working with parents who have asked us for accommodations and flexibility around programming that conflicts with their beliefs." (*Id.* ¶ 51.) Plaintiffs spoke at this meeting "to express their belief that all children should be supported equally," but felt "unsafe, unprotected, disrespected, and discriminated against by BVSD" at this meeting. (*Id.* ¶ 53-54.) Plaintiffs withdrew their children from the District. (*Id.* ¶ 159.)

**ARGUMENT**

**I.      Plaintiffs do not plausibly allege municipal liability under *Monell* (All Claims).**

Plaintiffs assert four claims, all under 42 U.S.C. § 1983, alleging violation of their First and Fourteenth Amendment rights. Because the claims are against the District, as opposed to individual employees, Plaintiffs must plausibly allege municipal liability under the framework set forth in *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998). Under *Monell*, municipal entities are not liable under Section 1983 merely because an employee violates a plaintiff's federal rights. *Jenkins v. Woods*, 81 F.3d 988, 993 (10th Cir. 1996). *Monell* liability is, instead, "limited to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-480 (1986).

Given this, a plaintiff suing a municipal entity under Section 1983 must prove that: (1) a municipal employee committed a constitutional violation, and (2) that violation was caused by an official policy or practice or by an official policymaker of the District. *Murphy v. City of Tulsa*, 950 F.3d 641, 649 (10th Cir. 2019); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1215 (10th Cir. 2003). As explained below, Plaintiffs do not plausibly allege any constitutional violation. But even if they had, Plaintiffs have not alleged facts, accepted as true, showing that any constitutional violation would have been caused by official policy or practice or by an official policymaker.

**A.      Plaintiffs have not plausibly alleged that an official policy or practice caused a constitutional violation.**

An official policy must be "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality]'s officers." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1249 (10th Cir. 1999). A "policy" is a "course of action consciously chosen

9

from among various alternatives." *Pembaur*, 475 U.S. at 483. An official practice is "so permanent and well settled as to constitute a custom or usage with the force of law." *Id.; see also Murphy*, 950 F.3d at 649 (describing municipal practices as "longstanding practices or customs that become standard operating procedures") (quotations omitted). Alleging a single unconstitutional act is not enough to sufficiently plead a "pattern or practice." *Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1170 (10th Cir. 2009). Plaintiffs do not allege that an official District policy caused a constitutional violation. (ECF 13 ¶¶ 160-93.) They allege, instead, that the District engaged in certain "practices" that violated Plaintiffs' constitutional rights. But their allegations, accepted as true, do not plausibly allege a municipal pattern or practice.

Plaintiffs allege that BVSD has a "practice" of discriminating against Plaintiffs' religious beliefs (*id.* ¶¶ 76-98, 125-36), yet they allege only a single instance where District staff allegedly did so: when Ms. Bedford did not allow Plaintiffs to opt their children out of "all transgender programming." (*Id.*) As noted, a single instance of alleged misconduct is not enough for municipal liability. *Nielander*, 582 F.3d at 1170.

Plaintiffs allege the District has a practice of violating its own policies regarding sex education (ECF 13 ¶¶ 99-124), but they allege only that District staff violated official policy related to Plaintiffs' single complaint of discrimination, not any others. (*Id.*) Plaintiffs seize on a single newsletter to teachers encouraging them to "weave" equity-centered themes into their lessons. (ECF 13 ¶¶ 112-14.) Even assuming this would amount to religious discrimination (which it manifestly does not), a single newsletter is not the type of "longstanding" practice that is "so permanent and well-settled" that courts have required for municipal liability, *Murphy*, 950 F.3d at 649, nor does it even suggest any *past* practice or custom; it encourages only future action.

Plaintiffs allege that District staff retaliated against them for asserting religious discrimination (ECF 13 ¶¶ 144-59), but they allege actions related only to their single complaint of discrimination: that Ms. Bedford held two days of "transgender" programming instead of one, that Mr. Anderson did not respond in full or on time to their complaint, and that Mr. Barber shared purported confidential information with a reporter. (*Id.*) While Plaintiffs have alleged several instances of conduct they claim are retaliatory, these allegations fall well short of establishing a "permanent and widespread" practice for municipal liability. *See Mitchell v. City and Cnty. of Denver*, 112 Fed. App'x 662, 671-672 (10th Cir. 2004) (plaintiff failed to plausibly allege that multiple instances of alleged retaliation against him constituted custom or practice); *Bradley v. D.C. Public Schs.*, 87 F. Supp. 3d 156, 161-62 (D.D.C. 2015) (no municipal liability where plaintiff failed to allege that school district "violated anyone's rights other than her own").

**B.    Plaintiffs do not plausibly allege that a "final policy maker" caused a constitutional violation.**

A municipality may also be held liable for the actions of an official with "final policymaking authority," that is, someone "who possess final authority to establish municipal policy with respect to the action ordered" and "the subject matter in question." *Pembaur*, 475 U.S. at 481-82, 483-84. Whether a government official is a "policy-making official" is "a question of state law" and concerns only "delegations of legal power." *Brammer-Hoeltler v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (internal citations omitted). Courts consider three factors to determine whether an official is a final policymaker: (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final or subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. *Id.* at 1189-90.

Plaintiffs do not allege that any final policymaker caused a constitutional violation. (ECF 13 ¶¶ 160-93.) Even if they had, Plaintiffs have not alleged facts, accepted as true, showing that a final policymaker caused a constitutional violation. Plaintiffs take aim at the alleged actions (or inactions) of Mr. Anderson, Ms. Fernandez, Mr. Barber, and Ms. Bedford. Plaintiffs allege that Ms. Bedford "carried out policies, practices, and decisions on behalf of BVSD" (*id.* ¶ 5), but they do not allege facts supporting this conclusory statement. *See Twombly*, 550 U.S. at 555 (naked assertions devoid of factual enhancement insufficient to survive dismissal motion). Otherwise, Plaintiffs have not alleged any facts supporting the factors listed above, including whether Ms. Bedford, Ms. Fernandez, Mr. Barber, or Mr. Anderson are "meaningfully constrained by policies" not of their making, whether their decisions are subject to meaningful review, or whether the decisions they purportedly made are within the realm of their authority.

In Colorado, school boards—not administrators or other staff—have final decision-making authority in their respective districts. Colo. Const. art. 9, § 15; *see Lawrence v. Sch. Dist. No. 1*, 560 Fed. App'x 791, 795 (10th Cir. 2014) ("[O]ur cases recognize that school boards, not lower-level administrators, are generally the final policymakers in public school districts because administrators are usually constrained by board-established policies.") (citing *Twin Peaks*, 602 F.3d at 1190)). Plaintiffs do not allege that the BVSD Board of Education delegated authority regarding the policy decisions alleged in the complaint. Thus, they fail to plausibly allege a violation by a final policymaker. *See Rodriguez v. Payler*, No. 19-cv-01388-CMA-KMT, 2020 WL 5026932, at *5-6 (D. Colo. Aug. 10, 2020) (granting motion to dismiss Section 1983 claims against school district where plaintiffs failed to plausibly allege that district administrators had been delegated final decision-making authority from school board).

Plaintiffs' also do not plausibly allege that Mr. Barber made a policy decision. They allege only that he shared confidential information with a reporter, (ECF 13 ¶¶ 153-54), which is not a "course of action consciously chosen from among various alternatives." *Pembaur*, 475 U.S. at 483.

In summary, Plaintiffs fail to plausibly allege municipal liability. Because Plaintiffs have asserted claims only against the School District, the Court should dismiss the complaint entirely.

## II.    Plaintiffs have not plausibly alleged a violation of the Free Exercise Clause of the First Amendment (Claim 1).

The First Amendment guarantees the right to free exercise of religion. U.S. Const. amend. I; *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940). To state a claim for relief under the Free Exercise Clause, Plaintiffs must allege more than the fact that a challenged action offends their personal religious beliefs. *Bauchman v. W. High School*, 132 F.3d 542, 557 (10th Cir. 1997). The challenged action "must be coercive or compulsory in nature." *Id.* Thus, Plaintiffs must plausibly allege that they were coerced or compelled to engage in school programming they find offensive. *Id.*

Plaintiffs allege that the District violated their free-exercise rights by refusing to let them opt their children out of "all transgender programming." (ECF 13 ¶¶ 11-26, 34-39, 99-111, 160-70.) Plaintiffs fail to plausibly allege that they were compelled to engage in this programming.

Plaintiffs admit that Ms. Bedford notified them well before the Raven musical that they could opt out of the performance. (ECF 13 ¶ 7; Ex. 1 to ECF 13; Ex. 26 to ECF 13.) Plaintiffs admit that they were provided an opt-out form several days before the musical. (ECF 13 ¶¶ 15-16, 123; Ex. 8 to ECF 13.) And they admit that they opted their children out of the musical based on their objection to its content. (ECF 13 ¶ 18.) Plaintiffs kept their children home the day of the performance and the day before given their objection to classroom discussions and videos related to the musical. (*Id.*) Plaintiffs do not allege that their children were penalized for missing those

school days, and the documents Plaintiffs cite in their complaint show that the children were not penalized. (Ex. 25 to ECF 13.) Thus, they have not plausibly alleged that they were coerced or compelled to engage in any programming related to the musical or the classroom discussions or videos related to that musical. *See Bauchman*, 132 F.3d 557 (rejecting free exercise claim where plaintiff had choice to engage in programming "with no adverse impact on her academic record").

To accommodate Plaintiffs' concerns related to transgender programming, and consistent with the District's "Teaching About Controversial Issues" policy, Ms. Fernandez instructed that, moving forward, the principal of Superior Elementary must, at least one week before an "instructional event" at which gender identity will be discussed, send a stand-alone email to all families informing them of the instructional event, any guest speakers who may be involved, and including a link to an opt-out form so that alternative activities can be arranged for children opting out. (ECF 13 ¶ 28; Findings, Ex. B.) The school would not, however, "opt students out of day-to-day discussions regarding gender that may arise organically in an elementary school classroom setting." (ECF 13 ¶ 117; 4/9/19 Bedford Email to Jones, Ex. C.) Ms. Bedford also told Plaintiffs that if they "would like more information about the planned curriculum, I am happy to facilitate a meeting." (ECF 13 ¶ 20; Ex. 2 to ECF 13, at 1.) In other words, aside from day-to-day discussions that may arise organically in the classroom, Plaintiffs would be alerted of any instruction about gender identity, given the opportunity to opt out, and have the option of alternative activities.

Plaintiffs allege that not allowing them to opt out of any such discussions, impromptu or not, violates District policy allowing families to opt out of sex education and health curriculum. (ECF 13 ¶¶ 99-124.) This assertion is based on the faulty premise that any discussion in school related to gender identity necessarily qualifies as sex or health education. It does not. In fact, the

programming that Plaintiffs find offensive—the Raven musical, the videos shown before the musical, and the newsletter with teaching tips—are designed to promote tolerance for others,[4] not to teach students about nutrition, reproduction, healthy relationships, diseases, or other topics that would fall under the gambit of sex or health education. *See, e.g.*, C.R.S. §§ 22-1-128 (comprehensive sexuality education), § 22-25-101 *et seq.* (comprehensive health education); (*Cf.* Exs. 13 and 14 to ECF 13). Promoting tolerance of transgender people is consistent with District policy. (Exs. 19 & 22 to ECF 13.) And based on Plaintiffs' own allegations, teaching tolerance of others is consistent with their Christian values, too. (*See* ECF 13 ¶ 126 (stating that, as Christians, Plaintiffs believe that "everyone [should] be treated with honor and respect").)[5]

Plaintiffs accuse the District of engaging in "a surreptitious campaign to subvert Plaintiffs' religious rights" based solely on the instruction newsletter encouraging teachers to "weave" equity-centered concepts into their lessons, including "transgender affirming" and "queer affirming" discussions. (ECF 13 ¶ 112-13.) But Plaintiffs have not alleged that their children were present for a lesson containing such topics, or that any teacher in the District, let alone one at Superior Elementary, wove these concepts into a lesson. Thus, Plaintiffs have not plausibly alleged that they personally have been impact by this newsletter. *Twombly*, 550 U.S. at 555 (Allegations must "raise a right to relief above the speculative level.").

---

[4] (Exs. 1, 5, 7, 19, 26 to ECF 13.)

[5] Plaintiffs suggest that Ms. Bedford's decision to bring the Raven musical and have students watch and discuss videos, or even partner with A Queer Endeavor, has no pedagogical value. This is an educational decision on Ms. Bedford's part that is entitled to deference. *Christian Legal Soc'y Chapter of the Univ. of Cal. V. Martinez*, 561 U.S. 661, 686 (2010).

For the reasons described, Plaintiffs fail to plausibly allege that the District violated their free-exercise rights. Thus, the Court should dismiss Plaintiffs' first claim.

## III. Plaintiffs do not plausibly allege a violation of the Fourteenth Amendment's right to direct the upbringing and education of their children (Claim 2).

The Fourteenth Amendment of the U.S. Constitution prohibits states from "depriv[ing] any person of life, liberty, or property[] without due process of law." U.S. Const. amend. 14 § 1. The Due Process Clause contains certain substantive rights, among them parents' fundamental liberty interest in making decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). This includes the right of parents "to direct the upbringing and education" of their children. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925).

This right, however, is "limited in scope," and parents have no fundamental right to exempt their children from educational programming they find objectionable. *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). Nor do parents "have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Id.* A state can violate substantive due process rights in two ways: (1) infringing on a fundamental right or (2) engaging in conduct so extreme it "shocks the conscience." *Lindsey v. Hyler*, 918 F.2d 1109, 1115 (10th Cir. 2019). Only the most "outrageous" official conduct is considered conscious-shocking. *City of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

Plaintiffs have not plausibly alleged that the District violated their substantive due process rights. First, they do not allege that they were subjected to conscious-shocking behavior, nor do their allegations, accepted as true, plausibly allege such "outrageous" behavior. Plaintiffs allege that the District denied them their fundamental right to direct the upbringing of their children by refusing to allow them to proactively opt out of all educational programming they found offensive.

(ECF 13 ¶ 76-124, 172.) This claim, however, is not plausible on its face, as the Tenth Circuit has concluded that parents have no fundamental right to exempt their children from educational programming they find objectionable. *Swanson*, 135 F.3d at 699; *see also Parents for Privacy v. Barr*, 949 F.3d 1210, 1232 (9th Cir. 2020) ("While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child.") (emphasis in original) (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005)).

Plaintiffs do not plausibly allege a violation of their substantive due process rights.

**IV.   Plaintiffs do not plausibly allege a violation of the Equal Protection Clause of the Fourteenth Amendment (Claim 3).**

The Equal Protection Clause guarantees that "all persons similarly situated shall be treated alike." *City of Cleburne, Tex. v. Cleburne Living Cntr.*, 473 U.S. 432, 439 (1985). To assert a viable equal protection claim, Plaintiffs must make a "threshold showing that they were treated differently from others who were similarly situated to them." *Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011). The similarly situated requirement is an "exacting burden," requiring that the comparative individuals "be *prima facie* identical in all relevant respects or directly comparable in all material respects." *Gallegos v. Adams Cnty. Sch. Dist. 14*, No. 17-cv-00306-CMA-NYW, 2017 WL 4236320, at *6 (D. Colo. Sept. 25, 2017). Plaintiffs must also plausibly allege that the District's action was motivated by an improper purpose as opposed to merely having a disparate impact. *Wash. v. Davis*, 426 U.S. 229, 239-42 (1976). In this vein, Plaintiffs must show that the District "acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (10th Cir. 1998).

Plaintiffs allege that they, as "religious parents," were treated differently than similarly situated "non-religious parents." (ECF 13 ¶¶ 179-86.) Thus, under the standard described, Plaintiffs must plausibly allege that the District treated them differently than similarly situated non-religious parents, similar "in all relevant respects," with an "intent or purpose to discriminate" against them because they are religious. Plaintiffs have not alleged facts, even accepted as true, that the District violated the Equal Protection Clause in this manner.

First, Plaintiffs have not plausibly alleged that they were similarly situated in all relevant respects with non-religious parents in the District. Plaintiffs allege, in conclusory fashion, that "religious parents" are "not treated like non-religious parents" and that Plaintiffs "were similarly situated to other [BVSD] parents" who may have wanted to opt their children out of educational programming. (ECF 13 ¶¶ 181-82.) Plaintiffs do not explain what a "religious parent" is or otherwise provide "factual enhancement"[6] plausibly alleging that they are "identical in all relevant respects or directly comparable in all material respects" with "non-religious" parents. *Gallegos*, 2017 WL 4236320, at *6. These allegations, even accepted as true, fall well short of the "exacting burden" courts require for an equal protection claim. *Id.*

Second, Plaintiffs do not plausibly allege that they were treated differently than similarly situated non-religious parents. Based on their claim, Plaintiffs must plausibly allege that they were treated differently than non-religious parents who, like them, sought to opt their children out of programming they found offensive. Plaintiffs have not asserted that any other parents, religious or otherwise, attempted to opt their children out of educational programming, let alone were treated

---

[6] *Twombly*, 550 U.S. at 555.

differently than Plaintiffs in doing so. Thus, Plaintiffs have not plausibly alleged, as they must, that they were "singled out" because they were religious or that non-religious parents were treated more favorably. *Gallegos*, 2017 WL 4236320, at \*7.

Third, Plaintiffs do not plausibly allege that any disparate treatment would have been motivated by discriminatory intent. Plaintiffs do not allege that the District acted with discriminatory intent (ECF 13 ¶¶ 179-86), nor do they allege facts from which the Court could infer that the District acted with such intent. They allege only that the District violated its own opt-out policies in a manner that violated their rights and caused them emotional and physical difficulty, but they do not assert that the District violated these policies with an intent to treat them differently because they are religious. For that reason, too, their claim fails. *See Martin v. Clements*, No. 10-cv-03139-RBJ-CBS, 2011 WL 6968160, at \*4 (D. Colo. Nov. 28, 2011) (plaintiff failed to plausibly allege that defendant acted upon a discriminatory intent or motive), *adopted and affirmed in* 2012 WL 71752 (Jan. 10, 2012) (J. Jackson).

 The Court should dismiss Plaintiffs' third claim for relief.

## V.  Plaintiffs do not plausibly allege that the District retaliated against them for engaging in constitutionally protected activity (Claim 4).

Plaintiffs allege that the District retaliated against them for engaging in free speech to assert their religious objection to "transgender programming." (ECF 13 ¶¶ 187-93.) To succeed on this claim, Plaintiffs must show: (1) they were engaged in constitutionally protected activity; (2) the District's actions caused them to suffer injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the District's adverse action was substantially motivated as a response to Plaintiffs' exercise of constitutionally protected conduct. *Weise v. Colo.*

*Springs, Colo.*, 421 F. Supp. 3d 1019, 1040 (D. Colo. 2019). Plaintiffs allege three retaliatory actions, none of which, even accepted as true, satisfies all three elements of this claim.

Plaintiffs first allege that Ms. Bedford retaliated against them by expanding the "transgender programming" from one to two days. (ECF 13 ¶¶ 144.) Viewing the alleged facts, as we must, in a light favorable to Plaintiffs, and crediting Plaintiffs' assertion that this action adversely impacted them (*id.* ¶ 144), Plaintiffs have not plausibly alleged that this action would chill free speech (element 2) or that it was motivate by discriminatory intent (element 3). Whether an act would "chill" protected activity is an objective standard. *McCook v. Spriner School. Dist.*, 44 Fed. App'x 896, 905 (10th Cir. 2002). No person "of ordinary firmness" would conclude that expanding transgender programming to cover portions of two days instead of just one, especially when Ms. Bedford said that teachers would show the videos before the musical, would chill a person's desire to object to programming he or she finds objectionable. Plaintiffs allege in conclusory fashion that this action was "by design," but provide no allegations supporting this naked assertion, meaning it does not meet the *Twombly* standard.

Plaintiffs also allege that District administrators retaliated against them by failing to fully and timely respond to their written complaints of religious discrimination. (ECF ¶¶ 188-91.) This allegation is not plausible on its face.

First, while Ms. Fernandez may not have responded to every grievance raised in Mr. Jones' initial and supplemental complaint, she did respond fully to the broader claims of discrimination raised in those complaints. (*Compare* Ex. B hereto (cited in ECF 13 ¶ 28) *and* Ex. 25 to ECF 13 *with* Ex. 4 to ECF 13.) She also conferred with Plaintiffs about their complaint shortly after it was filed. (Ex. 24 to ECF 13.) Thus, there was no adverse action (element 1); no person of ordinary

firmness would be chilled by Ms. Fernandez' response (element 2); and Plaintiffs have not plausibly alleged that her response was motivated by discriminatory intent (element 3).

Second, Ms. Fernandez was not meaningfully late in her response. Under District Policy AC-R, Ms. Fernandez, as the delegated compliance officer (Ex. 25 to ECF 13), had to issue written findings within 45 "school days" of receiving the complaint.[7] Mr. Jones filed his complaint on November 27, 2018, and Ms. Fernandez issued her findings on February 21, 2019—47 school days later, and only two days past the 45-day deadline.[8] Ms. Fernandez issued supplemental findings within 49 days of Mr. Jones' supplemental complaint (issued January 6, 2019), so only four days late. Even crediting the allegation that these minor delays adversely impacted Plaintiffs, no person of ordinary firmness would be chilled by such a minor delay in response (element 2), and Plaintiffs have not plausibly alleged that the delays were motivated by discriminatory intent (element 3).

Finally, Plaintiffs allege that Mr. Barber, the Chief Communication Officer, shared a "confidential" copy of their AC-E2 complaint with a reporter. (ECF 13 ¶¶ 153-54, 189.) This allegation is also not plausible on its face. First, complaints filed under policy AC-E2 are not confidential, as Plaintiffs allege (ECF 13 ¶ 146), unless the complainant requests confidentiality. (Ex. D at 3-4 (stating that requests for confidentiality will be honored).) Indeed, the complaint

---

[7] The Court may take judicial notice of this policy (**Ex. D** hereto), which is a public record and available to the public on the District's website. *Romens v. City of Colo. Springs*, No. 13-cv-01441-RM-KLM, 2015 WL 4607659, at *2-3 (D. Colo. Aug. 3, 2015) (J. Moore). A copy of this policy is available at: https://www.bvsd.org/about/board-of-education/policies/policy/~board/a-policies/post/ac-r-nondiscriminationequal-opportunity-regulation. Plaintiffs also cite to this policy several times in the exhibits attached to their complaint. (*E.g.*, Ex. 3 to ECF 13.)

[8] The Court may also take judicial notice of the BVSD School Calendar for the 2018-2019 school year (**Ex. E** hereto), which is a public document and publicly available on the District's website. *Romens*, 2015 WL 4607659, at *2-3. A copy of the school calendar is available at: https://old.bvsd.org/calendar/Documents/academicCalendar2018-19-final.pdf.

form itself does not state that it is confidential. (Ex. 4 to ECF 13.) Plaintiffs also suggest that AC-E2 complaints are considered "student records" and therefore confidential. (ECF 13 ¶ 153-54). Nowhere in Policy AC-R or Form AC-E2 does it state that. (Ex. D; Ex. 4 to ECF 13.) Either way, Plaintiff's complaint does not contain any personally identifiable student information that might be protected the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g. Further, Plaintiffs put the issue of their complaint before the District's Board of Education and spoke publicly in favor of their appeal, and the grounds for their complaint, in open session. (ECF 13 ¶¶ 53-54.) Thus, Plaintiffs have not plausibly alleged that they suffered an adverse action (element 1) or that Mr. Barber's alleged sharing of the report would chill a person of ordinary firmness from raising a religious discrimination claim (element 2). The Court should dismiss Plaintiffs' fourth claim.

## CONCLUSION

Plaintiffs do not plausibly allege municipal liability under *Monell* or state a viable claim that the School District violated Plaintiffs' constitutional rights. Thus, the Court should dismiss Plaintiffs' Amended Complaint (ECF 13) for failure to state a claim under Rule 12(b)(6).

Respectfully submitted this 11th day of March 2021.

*s/Elliott V. Hood*
Michael W. Schreiner
Elliott V. Hood
CAPLAN AND EARNEST LLC
3107 Iris Avenue, Suite 100
Boulder, CO 80301
Phone: (303) 443-8010
mschreiner@celaw.com
ehood@celaw.com
*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

This is to certify that on the 11th day of March 2021, a true and correct copy of the foregoing was filed with the US District Court of Colorado CM/ECF System which will notify the following:

J. Brad Bergford, Esq.
Illumine Legal, LLC
7887 E. Belleview Avenue, Suite 1100
Denver, CO 80111
Phone: 303.228.2241
Email: brad@lawillumine.com

*Attorneys for Plaintiff*

s/*Shellie Satterfield*
Shellie Satterfield, Paralegal