**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. ___  1:20-cv-03399 _____

LEWIS JONES; and

BRECKEN JONES; and

KJ, a Minor,
BY AND THROUGH PARENTS
LEWIS AND BRECKEN JONES
AS NEXT FRIENDS; and

RJ, a Minor,
BY AND THROUGH PARENTS
LEWIS AND BRECKEN JONES
AS NEXT FRIENDS; and

NJ, a Minor,
BY AND THROUGH PARENTS
LEWIS AND BRECKEN JONES
AS NEXT FRIENDS; and

   **Plaintiffs,**

v.

BOULDER VALLEY SCHOOL DISTRICT RE-2, Boulder, Colorado;

   **Defendant.**

_____

**AMENDED COMPLAINT FOR MONEY DAMAGES**
_____

**I.  PRELIMINARY ALLEGATIONS**

  1.  This is a civil rights action for money damages pursuant to 42 U.S.C. §1983 and

based upon violations of the First and Fourteenth Amendments to the United States Constitution,

brought to remedy a violation of constitutional rights of the Plaintiffs, who were students and parents in Defendant Boulder Valley School District RE-2 ("BVSD").

2.      Superior Elementary School ("SES") is in the Town of Superior, Colorado and is a school within, and under the authority of, Defendant BVSD.

3.      SES is a kindergarten-5th grade school.

4.      Jenn Bedford ("Bedford") was, during the relevant period, the Principal at SES, and she remains employed with BVSD at a different elementary school.

5.      As SES principal, Bedford carried out policies, practices, and decisions on behalf of BVSD. Ex. 1, Ex. 2.

6.      This is not a *respondeat superior* case.

7.      On November 16, 2018 Plaintiffs received an email from Bedford indicating that BVSD planned certain transgender programming for November 30, 2018 related to the BVSD health education and human sexuality education. The programming was to include three "Queer Kids Stuff" YouTube videos, the performance by a transgender choir of a transgender-themed musical called "Raven's True Self", and classroom discussion on human sexuality, including transgender issues. Ex. 1.

8.      Two of the three YouTube videos that were planned in conjunction with the health/human sexuality education programming were going to be shown to kindergarten through fifth grade students, and the third was designated for second through fifth grade students. It was not stated in the email on what day(s) the videos would be shown. The email provided internet links to the videos. A classroom lesson led by each classroom teacher on the gender fluidity spectrum and gender roles definitions was to occur the same day. *Id*.

9.      On November 18, 2018, Plaintiff parents received a second email from Bedford that was apparently in response to negative parental reactions and media coverage generated by her email of November 16, 2018. Ex. 26.

10.     Between November 16 and November 19, 2018, Plaintiff parents viewed the videos and noted that the videos' messages are decidedly intolerant of views such as Plaintiffs' religious views. The videos are replete with negative value judgments of persons with differing opinions to those espoused in the videos. In particular, the videos label opposing views as "mean" and "confused," and they assert that someday people who hold differing views, as do Plaintiffs based on their religion, "will know better."

11.     Based upon their sincerely held religious beliefs, Plaintiff parents determined to opt their students out of all the transgender programming.

12.     On November 19, 2018, Plaintiff parents sent an email to Bedford explaining their concerns, including that the decision to present transgender programming, as well as the opinions expressed in the programming videos, were intolerant, divisive, and in direct opposition to their religious views.

13.     On November 26, 2018, Bedford responded by email to Plaintiff parents, telling them that they could opt out of only one component of the transgender programming—namely the musical, "Raven's True Self." Ex. 7.

14.     What Plaintiff parents also learned around November 26, 2018 is that classroom discussions were planned whereby teachers would reinforce the objectionable messages of the videos and the play.

15.     On November 27, 2018, Bedford emailed Plaintiff parents to inform them of an upcoming email to include a link for all parents to opt their children out of the performance of "Raven's True Self." Ex. 7.

16.     While SES provided an online opt-out form for "Raven's True Self," an opt-out was not offered or provided for the objectionable videos or the associated classroom lessons. Ex. 8.

**Deleted:** .

**Deleted:** A

17.     On November 27, 2018, Plaintiff parents, in the hope of preserving their and their children's free exercise rights and their right to raise their children as they see fit, filed a formal, confidential complaint, known as an "AC-E2" complaint, with BVSD pursuant to official BVSD policies. Plaintiffs' complaint was based on religious discrimination. Ex. 4.

18.     On Thursday and Friday, November 29 and 30, 2018, Plaintiff parents kept their SES children home from school because of their religious objection to the material that would be presented both in videos, in classroom discussions, and in the musical.

19.     On Sunday, December 2, Plaintiff parents emailed each of the homeroom teachers of their three SES students to explain their concerns about the transgender programming, to request opt-out for each of their students from any transgender material, to request the immediate segregation of their students in the event that transgender issues arise, and to request immediate notification of such a situation.

20.     On Monday, December 3, 2018, Bedford emailed Plaintiff parents and Cc'd BVSD Assistant Superintendent, Robbyn Fernandez and BVSD general counsel, Melissa Barber, in response to the emails that Plaintiff parents sent to the homeroom teachers, saying, "[u]nfortunately, we are not able to accommodate your request to proactively opt-out your students from topics that might be offensive to your religious beliefs." Ex. 2.

4

21.     However, BVSD was already in violation not only of Plaintiffs' First and Fourteenth Amendment rights, but also of BVSD's written policies, including Nondiscrimination, Teaching About Controversial Issues, and Human Sexuality. Ex. 12 at 14-16.

22.     Plaintiffs' November 27, 2018 AC-E2 Complaint was unanswered as of January 6, 2019 when they filed an AC-E2 Amended Complaint to address additional issues. Ex. 9.

23.     BVSD finally responded long after the BVSD deadline to do so, and to this day, BVSD has failed to answer several of the questions/issues raised in Plaintiffs' AC-E2 Complaint and Amended Complaint. In short, BVSD has refused to address some of the issues raised in the Complaints.

24.     Plaintiffs' email was forwarded to Bedford, who responded on behalf of BVSD in an email in which she carbon copied BVSD assistant superintendent, Robbyn Fernandez and BVSD general counsel, Melissa Barber. Bedford's response expressly denied Plaintiffs' request to opt their children out of the problematic material on religious grounds, adding that SES would continue to follow various BVSD policies. Ex. 2.

25.     On November 27, 2018, Plaintiffs filed a formal, confidential "AC-E2" complaint. Ex. 4.

26.     Plaintiffs were also denied their right to free exercise of religion and the right to the care, control, and upbringing of their children as protected under the First and Fourteenth Amendments and as recognized in various court cases to opt their children out of the problematic programming by steps that BVSD took behind the scenes.[1]

---

[1] Under U.S.C.A. Const. Amend. 14, providing that no state shall deprive any person of liberty without due process of law, "liberty" denotes, not merely freedom from bodily restraint, but also the right of the individual to contract to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home, and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long

27.     In their AC-E2 complaint, Plaintiffs explained that the BVSD plan to teach sexuality information without a parental exclusion request form as required by the BVSD Rights and Responsibilities Handbook ("Handbook") was inappropriate, demonized those whose views differ from the views espoused in the curriculum, and violated their freedom of religion. Ex. 4.

28.     The District issued a partial response to Plaintiffs but substantially failed to respond to the items raised in Plaintiffs' AC-E2 complaint [Ex. 4] and amended AC-E2 complaint [Ex. 9].

29.     On November 26, 2018, Plaintiffs notified the Principal of Superior Elementary School, Jenn Bedford ("Bedford") that because of their religious beliefs, they wished to opt their elementary school children out of all transgender and human sexuality programming. Ex. 7.

30.     BVSD policies state that: "Under Colorado law, parents may excuse students from any portion or portions of the School District's comprehensive health education, including human sexuality education." Exs. 12, 13, 14, 15, and 16.

31.     Under BVSD policies, parents have the right to be informed regarding the content of these units of instruction or courses within BVSD's comprehensive health education and to exclude their child from any specific portion or portions of the instruction on the grounds that it is contrary to their religious beliefs and teachings or closely held personal beliefs. Exs. 12 at 14, 15 and Exs., 13, 14, 15, and 16.

32.     Each school is required to send home information regarding the material to be covered and a parental exclusion request form two weeks prior to the beginning of instruction on comprehensive health education.

---

recognized at common law as essential to the orderly pursuit of happiness by free men. *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923).

33.     SES did not initially send home the required parental exclusion request form but later constructed its form. Neither did SES send an overview of the topics and materials to be presented in the curriculum. Ex. 2.

34.     The Colorado statutory framework on sex education is called the Colorado Comprehensive Sex Education Act and is codified at C.R.S. §22-1-128 (the "Sex Ed. Act").

35.     Pursuant to the Sex Ed. Act, teaching on gender roles is part of comprehensive human sexuality education. C.R.S. §22-1-128(1)(a)(II), (b)(III), (2)(c),

36.     The District's published materials on health and human sexuality identify gender issues as falling within the opt-out provisions for fifth graders, eighth graders, and high schoolers. Ex. 16.

37.     The opt-out provisions are substantially in keeping with the Health Ed. Act and the Sex Ed. Act, and they create an expectation for parents in Defendants' school district that they will be allowed to opt their children out of listed sex and health topics/programming, including for children younger than fifth grade.

38.     Among the topics listed in Exhibit 16 that parents may opt their children out of are: negative influences and myths regarding sexual activity, gender expression and identity, sexual orientation, gender stereotypes, labels and stereotypes regarding gender identity and sexual orientation, healthy relationships, dating, marriage and intimacy.

39.     Despite this fact, Jennifer Bedford, the principal at Superior Elementary School refused to allow the opt-out for the kindergarten through fifth graders, which Plaintiffs, on religious grounds requested, in the interest of their children at Superior Elementary School children. Ex. 2.

40.     In denying Plaintiffs' requested opt-outs, Principal Bedford stated by e-mail, "Unfortunately, we are not able to accommodate your request to proactively opt-out your students from topics that might be offensive to your religious beliefs. We will continue to follow Board policies, including Nondiscrimination, Teaching About Controversial Issues and Teaching About Religion and Religious Issues in the Schools (specifically section A. Neutrality), and Human Sexuality (each of these documents linked in original)." Ex. 2.

41.     By stating that no opt-out would be provided even from topics that offend Plaintiffs' religious beliefs, Bedford discriminated against Plaintiffs on the basis of religion. Ex. 2.

42.     By stating in that same email that SES would "continue" to follow "Board policies" and by copying Assistant Superintendent, Robbyn Fernandez and BVSD in-house counsel (at that time), Melissa Barber, and because no correction was issued by the BVSD legal team or administration to the assertion that no opt-out would be provided from topics that offend Plaintiffs' religious beliefs, the email bore the imprimatur of BVSD. Bedford's email was an admission on behalf of BVSD that the SES denial of the opt-out for religious reasons was consistent with BVSD practice. Ex. 2.

43.     On November 27, 2018, Plaintiffs filed a formal, confidential "AC-E2" complaint with Defendant BVSD. Ex. 4.

44.     On January 6, 2019, Plaintiffs supplemented their AC-E2 complaint with additional material. Ex. 9.

45.     Plaintiffs complaint and supplemental complaint were responded to late and incompletely. This demonstrates the disregard that BVSD maintained for Plaintiffs' primary reason for filing the complaint: religious discrimination and refusal to allow them to control their children's educations. Ex. 4, 9.

46.     Plaintiffs ultimately filed a "KE" appeal of BVSD's denial of their complaint. The BVSD Board of Education refused to even hear their appeal, which amounts to more discrimination. Ex. 28.

47.     At the outset of the April 23, 2019 school board meeting where the issue before the Board was whether it would hear Plaintiffs' appeal, School Board President, Tina Marquis, gave an instruction to the standing room only crowd that, "as always, this will be a respectful place in which we can have rich discussions and talk about all of our students and their needs." Even so, audience members were permitted to cheer during the public comment period when speakers espoused BVSD-aligned views. Hissing and similar audible expressions of disapproval were permitted when Plaintiffs and others sharing their views spoke.

48.     Likewise, attendees including young children at the April 23, 2019 BVSD board meeting were permitted to hold large signs characterizing Plaintiffs' views as hateful and unsafe. Ex. 30[2].

49.     Those signs appear prominently in the BVSD video of the meeting posted to YouTube. The BVSD camera feed, which appeared on t.v. and still appears on YouTube even panned to show the signs accusing Plaintiffs of hate.

50.     At no time did the school board members or superintendent, all of whom had unobstructed views of the large signs, ask attendees with these signs asked to lower their signs. For the entire evening, those signed faced the very board that was about to vote on whether to hear the appeal. *Id.*

51.     Some attendees wore t-shirts suggesting violence to protect transgender children. Ex. 29.

---

[2] Video accessible at https://youtu.be/E_c9S3DRs1A (2:52:57 in duration).

52.     At no time did the school board or superintendent ask attendees to cover t-shirts promoting violence to protect transgender students against the likes of Plaintiffs.

53.     The podium used by community members for public comment bore two 8½" x 11" signs that faced speakers and were visible from across the room. The signs appeared to be made from construction paper. Both had yellow "equals" symbols against a blue background. The symbol is used in support of LGBTQ persons and to demonstrate opposition to anyone with whose views those persons might disagree. Written in one of the yellow "equals" signs was "BVSD Teacher." It seemed to communicate the idea that there are LGBTQ teachers in BVSD and may have been designed to generate additional feelings of sympathy or camaraderie with those teachers and against Plaintiffs. Written in the other were the words, "Equal Rights For All." The message there is that LGBTQ persons do not have equal rights, that this is the fault of people like Plaintiffs, and that opposing people like Plaintiffs is calculated to bring about equal rights for LGBTQ persons. The signs were permitted to remain for some time before an unknown person took them down.

54.     Superintendent Rob Anderson also commented at the outset of the meeting, saying that BVSD "has long been a leader in the support and celebration of diversity. We are nationally known for our practices and policies that support our LGBTQ community. BVSD stands firm behind our transgender students. There may not be a more vulnerable population in our school district or a group of students who count on us more to protect them. We are proud of our policies and practices that make our transgender students feel welcome and safe." He went on to say that BVSD has "a history of working with parents who have asked us for accommodations and flexibility around programming that conflicts with their beliefs. Where appropriate, we have not judged those beliefs and have worked with those families to accommodate these individual

10

desires." BVSD apparently does not find it "appropriate" to accommodate the religiously-motivated desires of Plaintiffs to simply opt out of transgender programming.

55.     Throughout the public comment portion of the school board meeting, there were audible expressions of approval and disapproval of speakers' messages. In what was emblematic of BVSD discrimination against Plaintiffs, the chairperson ignored her own and Rob Anderson's remarks about mutual respect and allowed attendees to cheer for speakers who share BVSD's views—namely that transgender programming should be part of even elementary education—and to literally hiss at Plaintiffs and other parents who simply and kindly asked that the appeal be heard.

56.     All these circumstances at the April 23, 2019 school board meeting made Plaintiffs feel unwelcome, unsafe, unprotected, disrespected, and discriminated against by BVSD.

57.     Plaintiffs spoke to express their belief that all children should be supported equally.

## II.     JURISDICTION AND VENUE

58.     This action arises under the United States Constitution, particularly the First and Fourteenth Amendments; and under federal law, particularly 42 U.S.C. §§ 1983 and 1988.

59.     This Court is vested with original jurisdiction over these federal claims by operation of 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. §1983.

60.     This Court is authorized to issue the requested relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

61.     This Court is authorized to award the requested compensatory damages in an amount to be proven at trial pursuant to 28 U.S.C. § 1343.

62.     This Court is authorized to award attorney fees pursuant to 42 U.S.C. §1988.

63.     Venue is proper in the United States District Court for the District of Colorado Under 28 U.S.C. § 1391(b), in that the events giving rise to the claim occurred within the district.

Deleted: <#>¶
¶

### III.    IDENTIFICATION OF PLAINTIFFS

64.    Plaintiffs Lewis Jones, Brecken Jones, who are next friends of KJ, NJ, and RJ, are residents of Boulder County, Colorado.

65.    Plaintiffs Lewis Jones and Brecken Jones are Christians.

66.    Plaintiffs Lewis Jones and Brecken Jones had three children in Superior Elementary School in Boulder County, Colorado at the time of the events that give rise to this action.

67.    Pursuant to their sincerely held religious beliefs, Plaintiffs wished to exclude their elementary school children from programming involving themes of human sexuality and gender issues.

68.    Plaintiffs communicated their religious beliefs and their desire to exclude their children from the human sexuality and gender issues programming to the Principal of SES. Ex. 7.

69.    The school violated Plaintiffs' religious liberties and Colorado's statutory protections for parents who wish to opt their children out of programming involving themes of human sexuality and gender issues.

70.    Plaintiff parents maintained a practice of reviewing school programming to ensure that they knew what was planned for their children.

### IV.    IDENTIFICATION OF DEFENDANTS

71.    Defendant Boulder Valley School District RE-2, Boulder, Colorado ("BVSD") is a body politic and corporate that may sue and be sued.

72.    BVSD is organized under the laws of the State of Colorado.

73.    Local governmental units, such as school districts, are considered persons to which 42 U.S.C. 1983 applies.[3]

---

[3] Monell v. Department of Soc. Servs., 436 U.S. 658 (1978).

74.     BVSD is charged with the administration and operation of Superior Elementary School (SES).

75.     As a governmental entity, BVSD enacts policies, both formal and informal, including those related to the constitutional rights of parents to direct the education and upbringing of their children and to live according to their religious beliefs, as well as overseeing compliance by BVSD schools with its policies and with state law.

76.     BVSD is responsible for its and its schools' decisions regarding permitting statutory opt-outs. It is responsible for the decision to deny Plaintiffs their constitutional and statutory right to opt their elementary children out of programming that violates their religious beliefs.

77.     The District is likewise responsible for the implementation and application of its policies on health education and human sexuality education.

78.     Pursuant to BVSD policies and practice, BVSD has repeatedly and in various ways denied Plaintiffs' fundamental right to direct the education of their children, has denied Plaintiffs the right to exercise their sincerely held religious beliefs, has violated BVSD policy in numerous ways beginning with depriving Plaintiffs of their First Amendment free exercise and Fourteenth Amendment due process rights, including by publicizing Plaintiffs' complaint, and have violated BVSD policies by denying Plaintiffs the right to exclude their children from certain health education programming and human sexuality education programming and by refusing to provide advance information about that programming.

**Deleted:** have

## V.     FACTUAL ALLEGATIONS

**BVSD has a *practice* of discriminating against Plaintiffs' religious beliefs and against their parental rights by violating its own policies regarding health education.**

79.     Although as of the events that give rise to this Amended Complaint BVSD had official written policies on the presentation of health topics and human sexuality education, its *practice* was to refuse to follow those policies when Plaintiffs (and other parents) indicated a desire to avail themselves of those policies based on their sincerely held religious beliefs, which are protected under the First Amendment.

80.     Bedford stated in an email on November 19, 2018, "We will continue to follow Board policies, including Nondiscrimination, Teaching About Controversial Issues and Teaching About Religion and Religious Issues in the Schools (specifically section A. Neutrality) and Human Sexuality." But that is exactly what BVSD did not do. Ex. 2.

81.     BVSD adopted policy IGAE (4/13/10) on health education. Some of the topics it includes are community and environmental health, consumer health, human growth and development, hereditary and developmental conditions, mental and emotional health, family life education, age appropriate instruction on family roles and expectations, child development, and parenting. Ex. 12.

82.     Additionally, BVSD adopted policy IGAE-E, which provides that "the goal of health education is to promote physical, intellectual, social, emotional and spiritual well being [sic], not just to prevent disease. A healthy school is one where all students receive consistent messages reinforcing their personal worth, supporting individual and family differences, and emphasizing personal responsibility for health choices." Ex. 15.

83.     IGAE-E echoes IGAE (Ex. 12): "Parents/guardians of all students shall be notified in writing prior to student's involvement in a health education course of instruction. The notice to parents/guardians informs the parents that they may exclude their child from a specific portion or

14

portions of the instruction on the grounds that it is contrary to the religious beliefs and teachings... ." Ex. 15.

84.    IGAE-E also provides: "Upon request, each school shall give parents/guardians an opportunity to review the materials to be used and participate in a conference with the instructor and principal in order to assist the parent/guardian in determining whether to request an exemption for the student from a specific portion of the planned instruction." Ex. 15.

85.    Fireside Elementary is an elementary school in BVSD.

86.    On or about March 8, 2021, a BVSD parent whose identity is protected by the Amended Protective Order in this case [ECF 53] recorded her video conference with Christa Keppler, principal at Fireside Elementary and Molly Kobus, counselor at Fireside Elementary. Ex. 31.

87.    The video conference was to discuss parent concerns about the transgender education program for kindergarteners through fifth graders, including 1) under what curricular category the transgender education falls, 2) advance notice to parents of instructional material and 3) the availability of opt-outs for families who desire one. The first issue that the parent raised was the deceptive, non-descript nature of the email that announced the transgender programming at Fireside. The parent complained that the email did not clearly or adequately inform parents of the transgender education programming. Ex. 32.

88.    The parent pointed out that the email that first mentioned the transgender programming at Fireside went out to parents after the school had already engaged in two days of transgender programming for kindergarteners, first graders, and second graders. Ex. 31 8:15-8:33, Ex. 32.

15

89.   During the video conference, the parent asked whether the BVSD transgender education program falls under health education or human sexuality.

90.   Principal Keppler repeatedly emphasized that Fireside follows BVSD policy with respect to its transgender programming for elementary students. Ex. 31 at 1:54-2:07, 8:44-8:59, 9:09-9:12, 9:18-9:29, 9:55-10:02, 17:40-17:54, 26:46-26:56, 27:47-27:58, 28:16-28:20, 29:04-29:16.

91.   Keppler confidently stated that another, unnamed BVSD school "[does not] ever communicate [about the transgender programming to parents] because it is just part of the fold and the nature of the curriculum." Ex. 31 at 11:30-11:49.

92.   Keppler emphasized that BVSD's legal department and director of counselors have approved how Fireside is providing transgender programming. Ex. 31 at 17:38-18:05.

93.   Keppler stated that if a parent disagrees with the transgender programming for kindergarteners through fifth graders, she has the right to file a complaint. Notably, she did not state that the parent has the right to opt out. Ex. 31 at 18:13-18:41.

94.   Keppler stated that it is not BVSD policy to provide an opt-out. Ex. 31 at 23:40-24:07, 26:04-26:12.

95.   Keppler stated that not only is it not BVSD policy to provide an opt-out for transgender programming for kindergarten through fifth graders, doing so is actually "frowned upon." Ex. 31 at 26:23-26:33, 26:47-26:56.

96.   Keppler stated that the transgender programming is woven through various subject matters pursuant to a couple of years of BVSD-sponsored training. Ex. 31 at 25:09-26:00.

97.     Keppler and Kobus emphasized that their instruction on the issue came from the district and the district's legal department. Ex. 31 at 26:51-26:56, 28:14-28:20, 29:08-29:16, 38:21-38:34.

98.     The parent in the video requested lesson plans and was told that to find those, she would have to click on "Register" and fill out some information in order to have them sent to her. Ex. 31 at 39:01-39:24.

99.     On two occasions during the conversation, the parent in the video conference characterized Fireside's failure to notify in advance as "widespread district practice," and her remark was uncontroverted. Ex. 31 at 29:39-29:49, 31:00-31:12.

100.    The parent in Ex. 31 pointed out that BVSD did not even notify parents of the transgender programming that falls under IGAE (health education) until after two days of instruction.

101.    The email that provided the notification was deficient and required parents to click to register for the instruction in order to find out about it, but that information was not presented in the email. Ex. 32.

102.    BVSD produces a form called "Exclusion from Human Sexuality Curriculum" (the "Exclusion Form"). The Exclusion Form begins by explaining that under Colorado law, parents may exclude their children from any portion(s) of the BVSD sex ed. curriculum. It goes on to state that parents may exclude their children from any aspect of the health curriculum (even if it does not involve sex ed.) on the grounds that the instruction is contrary to the parent's or the child's religious beliefs. Ex. 16.

103.    The BVSD "Exclusion Form" sets forth what topics covered in Health Education with fifth graders qualify as sexual health issues. Among those are:

Anatomy of male and female reproductive systems;

Biology of conception to birth;

Puberty - normal human variance;

Personal hygiene practices and health and safety;

*Id.*

104.    These sexual health issues listed on the "Exclusion Form" pertain to transgenderism.

105.    The "Exclusion Form" sets forth what topics covered in Health Education with fifth graders qualify as health issues (but not sexuality education issues). Among those are:

Gender stereotypes and body images in the media;

Pro-Social behaviors that reduce violence and bullying;

*Id.*

106.    The Health Topics listed on the same "Exclusion Form" apply to transgender issues.

107.    The BVSD "Exclusion Form" sets forth what topics covered in Health Education with eighth graders qualify as health issues (but not sexuality education issues). Among those are:

Gender expression and identity;

Sexual orientation;

Labels and stereotypes regarding gender identity and sexual orientation;

*Id.*

108.    The BVSD "Exclusion Form" sets forth what topics covered in Health Education with high schoolers qualify as health issues (but not sexuality education issues). Among those are:

Gender identity;

Sexual orientation;

Deleted: ¶

18

*Id.*

109.    According to the 2018-2019 BVSD Rights and Responsibilities Handbook, policy IGAE recognizes that both state statute and policies of BVSD protect the rights of parents of Kindergarten-8[th] graders to make important decisions about their child's education regarding health, human growth and development and human sexuality. Furthermore, the Handbook affirms parents' right to be informed and to exclude their students from *any* specific portion or portions of the instruction for religious reasons.[4] Ex. 12 at 14.

110.    The Handbook further provides that "[e]ach school will send home information regarding the material to be covered and a parental exclusion request form prior to the beginning of instruction." *Id*.

111.    The Handbook recognizes the same rights for parents of high schoolers. *Id*.

112.    In view of the Handbook's reliance on state statute for compliance, it is appropriate to review the protections of Colo. Rev. Stat. § 22-25-106 the Health Education Act (the "Health Act") in determining whether BVSD complied with its own stated policies.

113.    Each local comprehensive health education program which is adopted by a school district or board of cooperative services is bound by the Health Act. Colo. Rev. Stat. §22-25-106.

114.    Moreover, BVSD has adopted a local comprehensive health education program, and in its Handbook it has affirmatively constrained itself to abide by the Health Act.  Ex. 12 at 14.

---

[4] "Parents have the right to be informed regarding the content of these units of instruction or courses and to exclude their child from any specific portion or portions of the instruction on the grounds that it is contrary to their religious beliefs and teachings... ." Handbook at 14.

115.    Under the Health Act, parents have the right to exempt their children from a specific portion of the program on the grounds that it is contrary to the religious beliefs and teachings of the student or the student's parent or guardian. Colo. Rev. Stat. §22-25-106(4)(a).

116.    Under the Health Act, "The curriculum and materials to be used shall be made available for public inspection at reasonable times and reasonable hours and a public forum to receive public comment upon such curriculum and materials shall be held. Colo. Rev. Stat. §22-25-106(4)(b)(II).

117.    BVSD transgender programming as presented in Queer Kid Stuff Videos, in the musical, "Raven's True Self," and in accompanying classroom lessons falls under BVSD health education policy IGAE. Ex. 13.

118.    BVSD representatives, such as Bedford, asserted on various occasions that the transgender programming was for the benefit of transgender students and their acceptance in the SES community. Taking this to be true, the transgender programming certainly fell within the BVSD IGAE policy framework in that it ostensibly addressed community and environmental health, human growth and development, hereditary and developmental conditions, mental and emotional health, family life education, age-appropriate instruction on family roles and expectations, child development, and parenting.

**By presenting gender identity lessons to kindergarten through fifth graders, by not offering opt-outs for all such material, and by avoiding designation of gender identity lessons as sex ed., BVSD has a *practice* of violating/circumventing its own policies regarding sex education and thereby engaging in religious and parental rights discrimination.**

119.    The District has an official written policy of informing parents that they may opt their children out of certain lessons on human sexuality. Exs. 12, 14.

Deleted: ¶
¶

Formatted: Font: Italic

120.   However, BVSD does not follow its written policy and instead had a practice of denying opt-outs. Exs. 8, 19, 31, 32.

121.   Moreover, "human sexuality shall be a part of the health education curriculum." Ex. 12.

122.   Referring to District Policy IGAI (04/13/10), the Handbook states, "Instruction in human sexuality includes information dealing with the growth and development of the human body, human sexuality, and reproduction. Instruction is provided for every student in grades 5-8 and 10-12. The policy and regulation of human sexuality instruction outlines specific topics and guidelines for teachers and acknowledges the rights of parents." Ex. 12 at 14.

123.   All BVSD publications available at the time and which dealt with transgender programming categorized transgender programming/issues as either health education or sex education.

124.   No BVSD policy in place during the relevant period permits health education or human sexuality education, including transgender programming for kindergarteners through fourth graders. Yet, BVSD elementary schools (kindergarten through fifth grade) all participate in transgender programming for all grade levels.

125.   Parental notification and exclusion from within the human growth and development/human sexuality portion of the curriculum is accomplished by use of the health education program Parental Exclusion Request form (IGAE-E or IGAE-E2). Ex. 20.

126.   BVSD violated its own policy that "[o]nly District trained and approved staff shall teach the human sexuality curriculum." And "Community-based speakers may be used to enhance the health education curriculum by presenting timely and appropriate information on topics being

21

covered in the learning materials. Such speakers must be approved by the health education coordinator and will be listed in the health teachers' resource guide." Ex. 20.

127.   Plaintiffs found no evidence that this policy was followed. It appears that, like so many other BVSD policies, it was disregarded in favor of BVSD's practice of using its policies as façades behind which it could impose its agenda while running roughshod over Plaintiffs' civil rights.

128.   BVSD violated its policies because of animus against Plaintiffs' religious beliefs.

129.   Although this case is not about Colorado law, in assessing whether the gender programming that gives rise to this action is covered by the state statute on human sexuality education (the "Sex Ed. Act") as it existed in 2018, it is instructive to consider whether gender issues fall under the designation of sex ed.

130.   The Sex Ed. Act provides that:

(I)   "Colorado youth have a right to receive medically and scientifically accurate information to empower them to make the informed decisions that promote their individual physical and mental health and well-being;

(II)   This right applies to all youth regardless of...sexual orientation or gender expression;"

Colo. Rev. Stat. §22-1-128(1)(a)(II)

131.   The Sex Ed. Act is instructive in that it provides that gender and transgender issues are an integral component of sex education:

(III) The provisions of sexual and reproductive health education that incorporate comprehensive, evidence-based, culturally sensitive, and age-appropriate standards can result in youth delaying sexual activity until they are ready, avoiding unwanted consequences of sexual

behavior, learning medically accurate information about their health, and promoting positive youth-friendly messages concerning growth, development, body image, gender roles, and all aspects related to healthy, safe relationships and sexual behavior.

Colo. Rev. Stat. Ann. § 22-1-128(1)(b)(III)

132.    Under the Sex Ed. Act, "'Culturally sensitive' means the integration of knowledge about individuals and groups of people into specific standards, requirements, policies, practices, and attitudes used to increase the quality of services. "Culturally sensitive" includes resources, references, and information that are meaningful to the experiences and needs of communities of color; immigrant communities; lesbian, gay, bisexual, and transgender communities; people who are intersex; people with physical or intellectual disabilities; people who have experienced sexual victimization; and others whose experiences have traditionally been left out of sexual health education, programs, and policies."

Colo. Rev. Stat. § 22-1-128(2)(c)

In other words, from a legal standpoint, study of transgender communities and related matters is squarely in the category of human sexuality education.

133.    BVSD Board member Richard Garcia concurs, saying in an email that state law requires sex ed. to be taught in an LGBTQ, gender inclusive way and that parents have "every right" to opt their children out of sex ed. if they wish. Ex. 18.

134.    Despite the guidance of BVSD written policies and state law on point, BVSD engaged in a surreptitious campaign to subvert Plaintiffs' religious rights and rights to raise their children according to their conscience. In February 2019 a regular electronic BVSD publication to teachers instructed:

"We encourage you to intentionally weave one of the following equity-centered BLM guiding principles into your everyday teaching practice or an upcoming lesson:

- Restorative Justice

- Empathy

- Diversity

- Globalism

- Transgender Affirming

- Queer Affirming

- Intergenerational

- Black Families

Engaging your students and families in these honest conversations will spark critical reflection and ultimately leads to systemic change on educational issues that impact social justice." Ex. 5 at 2.

135.   This email informed Plaintiffs that their struggle was even bigger than they previously understood. Indeed, they were facing not only a school district that had abandoned its written policies and aligned itself with A Queer Endeavor, an organization that portrays Plaintiffs and those like them as hateful, judgmental, and intolerant, but they were also up against the Black Lives Matter organization, which has produced a great deal of LGBTQIA+ materials and made it available to school districts and others online.[5]

136.   The message violates not only the written BVSD sex ed. policies but reveals that BVSD has created an anti-Christian climate and method of instruction that is designed to elude detection and, thereby, opt-out requirements. For, if BVSD teachers intentionally weave the

Deleted: <#>¶

---

[5] https://neaedjustice.org/supporting-lgbtq-youth/ (accessed 11-16-20)

principles described into their everyday teaching practices, the principles might not be so easy to

spot as material presented at assemblies or designated "instructional events". If, by design, it is

difficult to spot, it will be difficult for parents to opt their children out, which is clearly the BVSD

unwritten goal. Ex. 5 at 2.

137.    The intentional weaving of ideology that teaches that people with differing views,

like Plaintiffs, are hateful is itself discriminatory. This BVSD practice harmed Plaintiffs.

138.    This is just one more way that BVSD, through efforts that violate its own written

policies, undercuts families whose religious beliefs are not the same as the beliefs of BVSD.

139.    On October 5, 2018, BVSD Superintendent Rob Anderson sent an email to BVSD

staff and families stating that "[BVSD has] worked closely with our *partners* at the CU-based A

Queer Endeavor to provide training for *all administrators and teachers* to ensure that all of our

students feel welcomed and supported and to implement LGBTQ-inclusive educational practices."

Ex. 36 (emphasis added).

140.    BVSD participated as study subject in a research study ("the Study") conducted by

A Queer Endeavor (AQE) and published March 27, 2018. Ex. 33.

141.    In the Study, BVSD worked to implement the "Guidelines" it received from AQE

and adopted in 2012. Ex. 33 at 7.

142.    BVSD's adoption of the "Guidelines" in 2012 provided the impetus for a larger,

three-year study in which the AQE research is embedded. Ex. 33 at 8.

143.    BVSD agreed to participate in the Study and to allow six of its schools to participate

in the Study. The Study sought to bring into effect policies that "challenge assumptions about sex,

gender, and sexuality" and to focus on how BVSD administrators "understood 'the work' of

25

bringing the district's Guidelines for Supporting Transgender and Gender nonconforming Students into practice." Ex. 33 at 2.

144.   "In this article, we draw attention to the important and often tenuous relationship between policy and practice, especially with respect to policies that challenge assumptions about sex, gender, and sexuality." Ex. 33 at 3. Thus, BVSD recognizes the connection that exists between sex, gender, and sexuality.

145.   Among other things, the Study explored how schools can help children transition from one gender to another—even over the objections of parents. This demonstrates that the BVSD transgender programming is substantially about indoctrinating kindergarteners through fifth graders with messages about sex, sexuality, and gender that are not only unapproved under state law but which also run contrary to the beliefs of parents like Plaintiff parents who hold religious views. This underscores the need for the opt-out and the religious discrimination that the denial of the opt-out represents.

146.   In an email on April 9, 2019, Bedford told Plaintiffs, ""The only opt out opportunities that will be available are for the instructional events described in Ms. Fernandez's determination.  No other opt out opportunities are available unless otherwise provided in District policy."  -Jennifer Bedford, CC Robbyn Fernandez 4/9/19. This informed Plaintiffs that their concerns were still not being addressed per BVSD written policies and confirmed yet again that the religious discrimination that they had encountered six months earlier was far from over. It also underscored that the denial of opt-outs and the religious discrimination were both part of BVSD practice—even if they were at odds with BVSD official written policies.

147.   Because BVSD policies indicate that gender issues are included in the sex ed. curriculum [Ex. 16.] and because BVSD policies point to state statute as governing its sex ed.

Formatted: Font: (Default) Times New Roman

Formatted: Indent: Left:  0", First line:  0.5"

policies (Ex. 12 at 14.), and because the Sex Ed. Act makes it clear that gender and gender expression issues are a necessary component of sex ed., there can be no doubt that when BVSD presents programming involving gender and gender expression, it is a matter of sex ed.

148.   All matters of sex ed. are also matters of health ed. because of how BVSD categorizes sex ed. Ex. 12 at pg. 14, Ex. 14.

149.   BVSD teachers who present sex ed. information are required to "consult with the building principal for such training. To be an approved instructor for human sexuality, a teacher will be required to complete the District directed in-service training." Ex. 20.

150.   Plaintiffs have no evidence that any of their children's teachers were approved instructors for human sexuality as of November 2018.

151.   Notably, Ex. 14 suggests that sexuality education is not available to students below 5th grade. However, Ex. 12 makes clear that parents have the right to exclude their children from health education, including sex education, beginning with their kindergarteners.

152.   BVSD provided an opt-out form for the performance of "Raven's True Self" that occurred on November 30, 2018 but not for classroom discussions or video material presented on November 29 and 30, 2018. Exs. 8, 17.

153.   Nevertheless, BVSD, in spite of its policies (including those indicating governance by Colorado law) and in spite of having effectively admitted that transgender programming constitutes sexuality education by providing the opt-out form for the performance of "Raven's True Self", BVSD has repeatedly denied that gender and transgender issues are properly a part of its sex ed. curricula and that such curricula can be opted out of. Ex. 1, Ex. 2.

154.   Additionally, Robbyn Fernandez stated in her Findings related to Plaintiffs' initial Discrimination Complaint, "It was determined that the topic and content of the assembly

27

conducted at Superior Elementary School on November 30, 2018 did not fall within the parameters of policy IGAI [which provides for opt-out]." Thus, BVSD affirmed that it properly denied the opt-out to Plaintiffs and would continue to do so in the future for programming on the same topics.

**BVSD has a *practice* of religious discrimination that was revealed in handling the Plaintiffs' formal complaints and which harmed Plaintiffs.**

155.    Plaintiffs are deeply religious, and they conduct themselves according to their religious beliefs.

156.    Among Plaintiffs' religious beliefs is that all people should be treated as having inestimable worth because they are created in the image and likeness of a loving God who sent His only Son to die for the sins of all people, equally. This belief governs Plaintiffs' interactions and demands that everyone be treated with honor and respect.

157.    On paper, BVSD encourages the reporting of unlawful discrimination or harassment as defined in Board policy to immediately report it to an administrator, counselor, teacher or the district's compliance officer and file a complaint as set forth in BVSD Regulation AC-R. "No student shall be subject to adverse treatment in retaliation for any good faith report of discrimination or harassment." Ex. 12 at 16.

158.    But the reality is that that in numerous ways as detailed in this Second Amended Complaint, BVSD has a practice of discriminating against those with religious beliefs, including Plaintiffs.

159.    Bedford's November 16, 2018 email indicating a transgender performance and related videos to be shown in conjunction with said performance violated Plaintiff's religious freedom as recognized in the First Amendment of the United States Constitution because it

provided no opt-out even though an opt-out was required precisely because some hold religious beliefs that conflict with teachings of BVSD. Ex. 1, Ex. 2. Compare Ex. 13, 14.

160.    Plaintiffs, almost immediately upon learning of the planned "Queer Kids Stuff" videos and the planned presentation of "Raven's True Self", emailed Bedford to voice their concerns. Ex. 19.

161.    On November 26, 2018, Bedford initially responded to Plaintiffs' initial email on the subject by stating that she had reviewed the material and determined its appropriateness. She also pointed to BVSD Guidelines Regarding Support of Students and Staff who are Transgender AC-E3. Ex. 22.

162.    Bedford later responded to emails that Plaintiffs sent to individual teachers explaining their religious choice to opt out of BVSD human sexuality and transgender programming at SES by emphatically stating that SES would not be able to accommodate Plaintiff parents' request to proactively opt their children out "from topics that might be offensive to Plaintiffs' religious beliefs." Ex. 2. Bedford later begrudgingly provided a Google link to an opt-out form [Ex. 8.] that was untimely and the form of which does not comply with BVSD written practices. Ex. 13 at pg. 4. However, the opt-out that Bedford offered applied only to the presentation of "Raven's True Self" but not to the Queer Kids Stuff videos or planned classroom discussions. Ex. 8.

163.    BVSD Chief Communication Officer, Randy Barber explained, in part, "As a part of our commitment to diversity, BVSD has long allowed families to work with their schools and opt out of certain instructional events on a variety of topics. Instructional events are planned lessons, assemblies and/or guest speakers, with reference to content that families may wish to opt out of. It is not our expectation that families or students are able to opt out of spontaneous

classroom discussions, including student expression or teachers responding to student questions. Schools are expected to specifically communicate with families in advance about assemblies and guest speakers." Ex. 10.

164.   This approach is deceptive in that it purports to offer an opt-out unless something spontaneous occurs in the classroom, but it is designed to facilitate unannounced classroom discussion of matters that are governed by BVSD health and sex ed. curricula. That is not "spontaneous," it does not comply with BVSD policies, and it is discriminatory to Plaintiffs.

165.   District Policies AC (Nondiscrimination/Equal Opportunity) 10/23/12, JB (Equal Educational Opportunities) 01/22/19, and JBB (Sexual Harassment), 10/23/12 provide that all members of the school community are treated with dignity and respect and that no student shall be subjected to discrimination or harassment under any district program or activity on the basis of, among others, religion. Ex. 12 at 16.

166.   BVSD policies and practices in this area differ substantially in ways that are discriminatory to Plaintiffs.

**BVSD engaged in religious discrimination by presenting sex ed. materials to K-5[th] students, engaging in educational partnerships, and avoiding its own written policies in ways that harmed Plaintiffs because of Plaintiffs' religious beliefs.**

167.   BVSD policy provides for "resource personnel" to oversee the sex ed. curriculum. Policy IGAI-R, "Resource personnel shall not advocate the use of specific community agencies nor special interest groups." Presumably, this is so that special interest groups cannot commandeer BVSD sex ed. policy. Ex. 20.

168.   However, BVSD partners with, and even sponsors, the LGBTQIA+ special interest group, A Queer Endeavor. Ex. 21.

169. A Queer Endeavor operates out of the School of Education at CU-Boulder. They focus on training teachers and teachers-to-be to "queer the classroom," to "disrupt heteronormativity," to "complicate students' binary thinking about gender," and deny opt-outs to "resistant parents." Ex.33.

170. The concepts of "queering the classroom," "disrupting heteronormativity," and "complicating students' binary thinking about gender" are, by design, in direct opposition to the beliefs of religious persons like Plaintiffs.

171. BVSD has worked with A Queer Endeavor since about 2012. According to the CU Boulder website, as of November 23, 2015, A Queer Endeavor had visited 11 BVSD schools and, in the fall of that year, provided three professional development sessions (2.5 hours each) with all Boulder Valley School District principals. A Queer Endeavor was contracted to provide a three-part Teacher Institute Series offered to all BVSD teachers during the 2015-2016 school year. Ex. 21.

172. AQE instructs: "Often, 'opting out' of LGBTQ-related curriculum is offered by uninformed, well-intentioned administrators and educators as a viable alternative to placate resistant parents. We strongly encourage teachers not to comply with that option and push volunteers to consider other possible solutions in the role play [on how to deal with resistant parents]. " Ex. 36 at 21.

173. Gender and sexuality are interrelated: "Given that, it would be impossible to disentangle gender and sexuality from 'regular' instruction; therefore, 'opting-out' is just not feasible." Ex. 36 at 21.

174. As indicated above, BVSD policies do not provide for the presentation of human sexuality material to children below the fifth grade. Plaintiffs pointed out BVSD's error in failing

to consider transgender programming as human sexuality material and even went so far as to offer to help remove ongoing religious discrimination from the school system. Ex. 24.

175.   BVSD Communication Director, Randy Barber, issued a March 20, 2019 email with broad distribution that alleges, among other things, that "[BVSD's] practice is to allow families to opt out of this material…." However, that is the official policy—not the practice as BVSD representatives made clear by their many acts which were in conflict with that assertion. Ex. 27.

176.   BVSD's practice of violating its official policies in favor of its transgender programming, combined with its denial of opt-outs to Plaintiffs represents religious discrimination against Plaintiffs.

## RETALIATION

**BVSD engaged in discriminatory retaliation based on Plaintiffs' sincerely held religious beliefs by disclosing sensitive student information in violation of FERPA and District Policies and by refusing to fully address Plaintiffs' complaint and supplemental complaint.**

177.   Bedford retaliated against Plaintiffs by revising what was to be a one-day special event on transgenderism for the kindergarten through fifth grade students to a two-day program in apparent response to Plaintiffs' Complaint. This adversely affected Plaintiffs, as was its design, because they then had to keep their students out of school for two days. Exs. 1, 17.

178.   Minor Plaintiffs suffered the loss of educational value by having to be kept out of school for two days because of the denial of opt-outs for transgender programming in the form of classroom discussion and the showing of a Queer Kids Stuff video.

179.    Bedford retaliated against Plaintiffs by not offering an opt-out form for the second day of "Raven's True Self."

Formatted: Font color: Auto

180.    Bedford retaliated against Plaintiffs by announcing via email that a proactive opt-out would not be granted.

181.    BVSD handbook provides that "[t]he staff and administrators of BVSD safeguard the educational records of students in accordance with the requirements of federal and state laws, and consistent with district policy." Ex. 12 at 13, 14.

182.    BVSD policy is that AC-E2 complaints and student records are to remain confidential.

183.    Plaintiffs' AC-E2 discrimination complaint contained information about Plaintiff minor students. AC-E2 complaints must be kept confidential as stated in BVSD Master Policy AC. Moreover, Plaintiffs requested confidentiality of their AC-E2 discrimination complaint both verbally and in writing. Ex. 4.

184.    On April 22, 2019 the Boulder Daily Camera published the first of two articles and one "Staff Editorial" about the parent concerns regarding the transgender programming at SES. Aside from its inaccuracies, the April 22, 2019 article included confidential information that Plaintiffs had shared only in their AC-E2 discrimination complaint [Ex. 4] and which could allow readers to connect the information to Plaintiffs, including Plaintiff minors. The information was published the night before the BVSD board of education meeting where the board was to decide whether to hear Plaintiffs' KE appeal.  Plaintiff parents spoke with the journalist who published the stories and learned that Randy Barber, BVSD's Chief Communication Officer had simply provided a copy of Plaintiffs' confidential AC-E2 complaint to her without so much as an open records request. The confidential discrimination complaint documents were part of the minor

plaintiffs' private student records. BVSD leaked them to retaliate and negatively affect the outcome of Plaintiffs' administrative (KE) appeal. Ex. 10.

185.    BVSD policy states that "[n]o student shall be subject to adverse treatment in retaliation for any good faith report of discrimination or harassment." Ex. 12.

186.    Yet, the climate at SES became decidedly caustic for the families who opposed BVSD's transgender curricular endeavors.

187.    BVSD teachers were overheard at school openly maligning the families who complained about the SES transgender materials in November 2018.

188.    BVSD teachers and community members posted hostile messages online, including on the BVSD "Safe Schools" facebook page. What gets posted online can get back to children and harm them. That the lack of acceptance can be damaging to young people is a central concept forwarded by BVSD and A Queer Endeavor. Yet, BVSD did not hesitate to retaliate against Plaintiffs when given the opportunity to do so.

189.    On April 22, 2019, the BVSD Safe Schools Coalition, which is the BVSD staff and faculty LGBTQIA+ arm of BVSD even posted a message on its facebook page pointedly calling for LGBTQ supporters to show up at the school board meeting the following night to oppose Plaintiffs, who it acknowledged had filed a religious discrimination complaint against BVSD. The post mischaracterized Plaintiffs' complaint as anti-LGBTQIA+ students and falsely stated that Plaintiffs had attacked them. It is likely that the Boulder Daily Camera story that stemmed from Randy Barber's providing of Plaintiffs' confidential AC-E2 Complaint is what inflamed the person who posted this on the BVSD SSI facebook page. Ex. 23.

190.    As if the retaliation of releasing personal, confidential information and stirring up a crowd to oppose Plaintiffs at a school board meeting was not enough, Rob Anderson and Robbyn

**Deleted:** Initiative

34

Fernandez still refused to answer Plaintiffs' complaint in a timely way and refused to answer certain issues raised.  In fact, Rob Anderson, the BVSD superintendent and the compliance officer, failed to answer the central issues raised in the discrimination complaint. Ex. 3.

191.    Plaintiffs, in vain, made numerous requests for timely and complete responses to their religious discrimination complaint. Ex. 3, 11.

192.    On February 19, 2019, Plaintiffs notified Rob Anderson, Robbyn Fernandez and the Board of Education of the missed deadline. On February 20, 2019, Plaintiffs asked Shawna Rendon to have Robbyn Fernandez reply to their Complaint. On February 21, 2019, Robbyn Fernandez delivered an incomplete report with three blank pages. On February 21, 2019, Plaintiffs emailed the Board of Education to notify it of the lack of seriousness in responding to the Complaint, including that the response was incomplete and a week late. On February 22, 2019, Plaintiffs asked why the report was incomplete. On February 22, 2019, BVSD Superintendent, Rob Anderson invites Plaintiffs to file a KE complaint if they are unsatisfied with the treatment of their AC Complaint. On February 22, 2019, Plaintiffs ask Superintendent, Rob Anderson if he does not intend to complete the report and why he had not completed the duties of compliance officer. On February 25, 2019, Superintendent Anderson said that he would "get back" to Plaintiffs and claimed that he was able to extend the deadline of the first Complaint. On February 25, 2019, Plaintiffs explained why the report is incomplete and requested an answer on when the findings would be complete. On February 25, 2019, Robbyn Fernandez "revised" the incomplete report by deleting three blank pages and forwarding it to Plaintiffs. On February 25, Plaintiff emailed Robbyn Fernandez to inquire about the status of the response to the Complaint. February 25, 2019, Rob Anderson promises to "be in touch" about the concerns that the Plaintiffs voiced. On February 28, 2019, Plaintiffs made a third inquiry as to when Anderson and Fernandez intended to complete

their findings. On March 1, 2019, Anderson delayed again, saying that he would "work on a timeline" for addressing the late Complaint "next week." On March 3, 2019, Plaintiffs filed a KE Complaint about compliance officer failures. On March 8, 2019, Anderson responded to the KE Complaint. On March 9, 2019, Plaintiffs reminded Anderson of the March 12, 2019 deadline to respond to the second Complaint and renewed their request for an independent and unbiased investigator to be named. By March 2019, Plaintiffs had for some time had the impression that they were getting the runaround in retaliation for their religious beliefs. On March 12, 2019, Anderson promised a supplemental report to be provided by March 22, 2019 (ten days late). On March 12, 2019, Plaintiffs warned Anderson that he has a direct duty to act as the compliance officer and to take responsibility for responding to the Complaint, rather than blaming his designee for being out of town. On March 12, 2019, Plaintiffs appealed the KE to the Board of Education. On April 23, 2019, the BVSD Board of Education refused to even consider Plaintiffs' KE appeal. Ex. 35

193.    Anderson and Fernandez never fully responded or issued findings to Plaintiffs' Complaints.

194.    BVSD appears to have realized that Plaintiffs were right about their concerns and decided to play games with Plaintiffs rather than respond substantively and meaningfully to their requests and concerns set forth in their discrimination complaint.

195.    Throughout their initial emails and in their complaint and supplemental complaint, Plaintiffs repeatedly indicate that their complaints are based on their religious freedom and their faith. Still, Superintendent, Rob Anderson and Assistant Superintendent, Robbyn Fernandez state in emails that Plaintiffs complaints are not about religious discrimination. Ex. 6, Ex. 11, Ex. 25.

196.   At the April 23, 2019 board meeting, BVSD allowed Plaintiffs to repeatedly be called hateful, homophobic, transphobic, and to be booed for their religious beliefs.

197.   Because of their great mistreatment and systematic alienation by BVSD, Plaintiffs cannot return to Boulder Valley Schools.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Violation of First Amendment Freedom of Religion**

198.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

199.   The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiffs' rights to free exercise of religion.

200.   Plaintiffs have sincerely held religious beliefs that govern their conduct and views.

201.   Plaintiffs' religious views are sincerely held and do not inhibit the freedoms of others.

202.   BVSD's practice of abandoning its written policies whenever it sees fit and with disregard to Plaintiffs' religious beliefs violates Plaintiffs' First Amend right to practice their religion and to be free from government impingement of their religion.

203.   BVSD maintains unwritten practices of abandoning its written policies at its own convenience and at the expense of Plaintiffs and their rights.

204.   BVSD lacks a compelling, legitimate (or even rational) interest in its pattern of willfully ignoring its written policies which, presumably, exist to maintain the façade of the rule of law and of the civil rights of the families it exists to serve.

205.   That BVSD has practices that repeatedly conflict with its written policies shows its lack of a compelling interest in violating Plaintiffs' religious freedom under the First Amendment.

37

206.   The BVSD practice of abandoning its official policies burdens Plaintiffs' sincerely held religious beliefs while at the same time setting up a pervasive system of individualized preference for those who do not hold religious views similar to those of Plaintiffs.

207.   BVSD's attempts, through its transgender programming, to alienate and intimidate Plaintiffs by telling students that there is no gender "norm," by seeking to "disrupt heteronormativity," and by saying that people who are of a different view, i.e., Plaintiffs because of their religious views, are "hateful," "uneducated," and may someday understand, as indicated in Queer Kids Stuff videos shown and promoted by BVSD constitutes religious discrimination.

208.   Statutory and policy provisions for opt-outs *are* a primary mechanism to protect First Amendment religious liberty of parents and children. By refusing opt-outs for material on the basis of religious beliefs, BVSD denied Plaintiffs' religious liberty as protected by the First Amendment.

**Formatted:** Font: Italic

209.   BVSD's actions in this regard have caused, are causing, and will continue to cause Plaintiffs emotional and financial hardship as Plaintiffs have had to pull their children out of BVSD and engage in a combination of home educating and private schooling at great personal financial expense, the amount of which will be proved at trial.

210.   Plaintiffs pray for relief against BVSD as hereinafter set forth in their prayer for relief.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Violation of Fourteenth Amendment Right to Direct the Care and Upbringing of Children**

211.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

212. BVSD's pattern and practice of avoiding compliance with its written policies deprived Plaintiff parents of their right to the care, control, and upbringing of their children as recognized by court decisions pursuant to the First and Fourteenth Amendments of the U.S. Constitution.

213. The denial of a parent's ability to make fundamental decisions regarding her child's education rises to the level of a constitutional violation.[6]

214. The Due Process Clause of the Fourteenth Amendment guarantees heightened protection against government interference with certain fundamental rights and liberty interests, including the right of parents to direct their children's upbringing.

215. Defendant BVSD interfered directly with Plaintiff parents' rights in this regard by denying the statutorily- and policy-required opt out and then refused to remedy the interference in the course of the administrative remedy process in which Plaintiffs, but not Defendant BVSD, engaged fully.

216. BVSD's actions in this regard caused Plaintiffs emotional difficulty and financial hardship during and after the period of the 2018-2019 school year as Plaintiff parents had to pull their children out of BVSD schools and engage in a combination of home educating and private schooling at great personal financial expense, the amount of which will be proved at trial.

217. Plaintiff children, meanwhile, suffer greatly because of this deprivation and have lost countless friends in the process.

218. Plaintiffs pray for relief against BVSD as hereinafter set forth in their prayer for relief.

---

[6] *See Meadows v. Lake Travis Indep. Sch. Dist.*, 397 Fed.Appx. 1, 3 (5th Cir.2010) (unpublished) (per curiam), quoted in Doe v. Dallas Indep. Sch. Dist., 194 F. Supp. 3d 551, 561 (N.D. Tex. 2016).

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Violation of Fourteenth Amendment Equal Protection**

219.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

220.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to equal protection under the law.

221.    Equal Protection Doctrine requires that similarly situated persons be treated similarly.  However, Boulder Valley Schools parents who wish, for religious reasons, to exclude their children from the problematic programming are not treated like non-religious parents.

222.    Plaintiffs were similarly situated to other Boulder Valley Schools parents in that they had the right, and may have chosen, because of religious or for other reasons, to exclude their children from certain programming.  The BVSD transgender programming and curricula, and the way that they are carried out, deny equal protection to Plaintiff (and other) parents who, for religious or other reasons, wish to exclude their children from the teachings.

223.    BVSD has abused its policies, and thereby Plaintiffs, through a systematic mechanism by which it favors some parents because of their beliefs while disfavoring others because of their beliefs.

224.    BVSD's actions in this regard have caused Plaintiffs emotional difficulty, physical difficulty, health difficulty, and financial hardship during and after the period of the 2018-2019 school year as Plaintiff parents had to pull their children out of BVSD schools and engage in a combination of home educating and private schooling at great personal financial expense and great health expense, the amount of which will be proved at trial.

225.    Plaintiff children, meanwhile, suffer greatly because of this deprivation and have lost countless friends in the process.

40

226.    Plaintiffs pray for relief against BVSD as hereinafter set forth in their prayer for

relief.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Retaliation in Violation of Religious Liberty**

227.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

228.    By filing a formal complaint in close adherence to BVSD policies and procedures,

Plaintiffs were engaged in free speech and petitioning the government for a redress of grievances.

Plaintiffs' activities in this regard are constitutionally protected under the First Amendment.

229.    BVSD's adverse action in violating Plaintiffs' rights under the United States

Constitution and BVSD policies regarding the AC-E2 complaint process and the KE appeal

process caused Plaintiffs to suffer injuries that would likely chill a person of ordinary firmness

from continuing to engage in the activity of filing what is supposed to be a confidential complaint

regarding discrimination where personal information about parents and their children, as well as

sensitive subject matter, is shared. BVSD's practices and actions whereby it disregarded Plaintiffs'

rights, as well as its own stated policies, caused Plaintiffs relational difficulties and difficulties

navigating what is otherwise a straightforward complaint process.

230.    Plaintiffs had to repeatedly ask for responses to their complaints, and they never

got those responses. This was a not-so-subtle demonstration of utter disregard, if not contempt, for

Plaintiffs' constitutional rights.

231.    BVSD's actions in this regard were intended and carried out in retaliation against

Plaintiffs, whom it wrongly regards as hateful, uncaring, and anti- certain students.

232.    Plaintiffs have asked other parents to participate in this legal action through

providing evidence and by sharing their stories. All of the parents whom they have asked have

41

been reluctant to participate—many precisely because of their fear of retaliation like that faced by Plaintiffs at the hands of BVSD.

233.   BVSD's actions resulted in Plaintiff children having to flee their neighborhood school (they live just three blocks from SES) and school district, and it caused them to permanently lose many valued relationships both with students and teachers.

234.   Plaintiffs pray for relief against BVSD as hereinafter set forth in their prayer for relief.

**PRAYER FOR RELIEF**

235.   Plaintiffs pray for economic damages in compensation for the expenses incurred in home educating their children up to a certain grade level and private educating their children after that grade level through high school, all of whom would attend BVSD schools were it not for BVSD's actions in violation of their constitutional rights. These damages are both retrospective and prospective.

236.   Plaintiffs further pray for non-economic damages up to any applicable limit provided by statute and exemplary damages to any extent allowed by law, as well as attorney fees, costs, and interest as set forth in 42 U.S.C. §1988, and for such other and further relief that the Court deems just and proper.

Respectfully submitted this 11th day of May, 2021.

ILLUMINE LEGAL, LLC
/s/ *J. Brad Bergford*
J. Brad Bergford, CO Bar no. 42942
Attorney at Law
7887 E. Belleview Avenue, Suite 1100
Denver, CO 80111
Phone: 303.228.2241
Email: brad@lawillumine.com
Attorney for Plaintiffs

42

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System. The Defendant's documents are being served via email per the Defendant's counsel's agreement to waive formal service.

/s/ J. Brad Bergford
J. Brad Bergford

**Deleted:** December

**Deleted:** 31

**Deleted:** 0

**Deleted:** *Michelle L. McMacken*

**Deleted:** Michelle McMacken