## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03399-RM-NRN

**LEWIS JONES** and **BRECKEN JONES** and **KJ**, a Minor,
BY AND THROUGH PARENTS LEWIS AND BRECKEN JONES
AS NEXT FRIENDS; and **RJ**, a Minor, BY AND THROUGH
PARENTS LEWIS AND BRECKEN JONES AS NEXT FRIENDS;
and **NJ**, a Minor, BY AND THROUGH PARENTS LEWIS AND
BRECKEN JONES AS NEXT FRIENDS;

Plaintiffs,

v.

**BOULDER VALLEY SCHOOL DISTRICT RE-2,** Boulder, Colorado,

Defendant.

---

## PLAINTIFFS' RESPONSE TO MOTION TO DISMISS
## PURSUANT TO FED. R. CIV. P. 12(b)(6)

---

Defendant erroneously contends that Plaintiffs have not plausibly alleged 1) municipal

liability under *Monell* and 2) that BVSD violated their constitutional rights. However, not only do

Plaintiffs' allegations satisfy *Monell* and plausibly allege constitutional violations, the Second

Amended Complaint does so using the statements of two of Defendant's high-level employees: an

elementary school principal and counselor. Defendant's motion to dismiss contends that Plaintiffs

have not plausibly alleged facts that can survive a motion to dismiss. To survive a motion to

dismiss for failure to state a claim upon which relief can be granted, factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true even if doubtful in fact. *Bell Atl. Corp. v. Twombly*, 550 U.S.

544 (2007). In assessing whether a plaintiff has stated a claim, on a motion to dismiss for failure

1

to state a claim, the court accepts as true all well-pleaded factual allegations, and construes all factual inferences in the light most favorable to the plaintiff. *Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir.), cert. denied, 141 S. Ct. 894 (2020).

**MONELL LIABILITY**

### I.    *Legal Standard.*

Much of Defendant's Motion to Dismiss is devoted to *Monell* liability. Proof of municipal liability sufficient to satisfy *Monell* requires: (1) an official policy, or custom, of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy, or custom. *Jauch v. Choctaw Cty.*, 874 F.3d 425 at 435 (5th Cir. 2017). However, *Monell* clarifies, "[l]ocal governments may be sued for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 at 691 (1978). In other words, municipal liability may properly attach to Defendant based upon the way it commonly does things. Thanks to statements by Defendant's employees in the video (ECF 59/Exhibit 31 to the Second Amended Complaint, conventionally submitted on flash drive) wherein they point to the BVSD school board, BVSD district leadership, and the BVSD legal department, and thanks to emails and publications by BVSD personnel, Plaintiffs' Second Amended Complaint successfully alleges municipal liability under *Monell*. (Plaintiffs provide a transcript of ECF 59 as Exh. 1 hereto.)

### II.    *Monell liability via emails.*

Defendant, through emails form Superior Elementary School Principal Jennifer Bedford ("Bedford") failed to comply with notice and opt-out requirements of C.R.S. §22-1-128(3)(a). with similar requirements of C.R.S. §22-25-106(4), which are expressly established to protect parents'

rights to opt their children out on the basis that health ed. curriculum is contrary to their religious beliefs. The Amended Complaint (ECF 13), and especially the Second Amended Complaint (ECF 57-1) set these allegations forth in detail at paragraphs 13-16, 20, 24, 27, 29, 30, 31, 40-42.

By Defendant's admission, Bedford wrote, "If you wish to opt your child out of [the] November 30[] performance, reply to this email." (Exh. 7 & 19.) This directive does not comply with state law, and the Second Amended Complaint plainly alleges that this is one way in which Defendant violated Plaintiffs' religious liberty, their right to the care, control and upbringing of their children, and the equal protection of the laws.

Defendant also admits that Bedford sought to justify the opt-out approach, saying that "it is District policy" to support students and staff the way that Bedford did. *Motion* at 4, citing Exhs. 19 & 22. Defendant overlooks the import and the implied admission in Bedford stating, "[unfortunately, we are not able to accommodate your request to proactively opt-out your students from topics that might be offensive to your religious beliefs." (ECF 57 ¶ 20.) In this statement, Defendant acknowledged that it was taking action that it knew would violate Plaintiffs' religious beliefs, and it did so anyway. Importantly, however, Bedford indicates her reliance upon what she referred to as "BVSD Board Policy" in support of her actions. (ECF 57-19 ¶ 2.) The admission that Defendant's school board is behind her actions should be all that is needed to survive the motion to dismiss. Even so, there is much more to support municipal liability.

Bedford's email communications that further support municipal liability under *Monell* include the brazen email to Plaintiffs in which she copied Assistant Superintendent Robbyn Fernandez, admitting, "We will continue to follow Board policies [denying Plaintiffs' *requested* opt-outs and advance notice for *religious* reasons]." (ECF 57-4/Second Amended Compl. Exh. 2), and her April 9, 2019 email to Plaintiffs and carbon copying Assistant Superintendent Robbyn

3

Fernandez saying, "[t]he only opt out opportunities that will be available are for the instructional events described in Ms. Fernandez's determination. No other opt out opportunities are available unless otherwise provided in District policy." ECF 57-1 ¶146. Because, as the Second Amended Complaint makes clear, Defendant repeatedly claimed that it had followed board policies, the allegations of discrimination based on Bedford's emails satisfy *Monell*.

### III.    *Monell liability via video (ECF 59/Exh. 31 to the proposed Second Amended Complaint).*

The video that gave rise to the Motion to Amend captured a Zoom conference between a Fireside Elementary parent and principal, Christa Keppler and counselor, Molly Kobus. (ECF 59: Exh. 31 to Second Amended Complaint, Transcript attached hereto as Exh. 1.) Defendant cites *Myers v. Oklahoma* for the proposition that plaintiffs must plausibly allege municipal liability under *Monell*. Under *Myers*, "[i]nadequate police training may, in some circumstances, result in constitutional liability for a municipality. However, '[o]nly where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy"—can a city be liable for such failure under § 1983.'" *Myers v. Oklahoma Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (internal citations omitted). Even so, "[w]here plaintiff in § 1983 action claims that particular municipal action itself violates federal law, or directs employee to do so, resolving issues of whether municipality had requisite degree of culpability and whether direct causal link existed between municipal action and deprivation of federal rights is straightforward, as § 1983 contains no state-of-mind requirement independent of that necessary to state violation of underlying federal right. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397 (1997).

In the video, Keppler and Kobus repeatedly refer to the transgender programming as part of the "curriculum." (Exh. 1 Video Transcr. at 11:47, 13:34, 14:01-06, 18:16, 18:31-38.) That

means that the programming is a conscious choice by Defendant. Plaintiffs allege not that Defendant failed to train its employees who, in turn, committed constitutional violations but rather that Defendant *trained* employees to commit those violations. (ECF 57-1, Second Amended Complaint at ¶¶ 20, 42, 90, 91, 92, 95, 96, 97, 99, 139, 145, 146, 154, 169, 172, & 173.) In short, the Second Amended Complaint alleges that Defendants went above and beyond those acts necessary for municipal liability to attach.

As to statutory requirements, Keppler also contends that with regard to the transgender programming, she "didn't even think about sending communication to parents in advance about this because often times just like with many of the lessons that [Kobus] does, [the school is] not sending that communication out in advance telling everything that she's teaching right because we're not expected to as schools." (Exh. 1 Video Transcr. at 9:08-23.) Keppler continues, "We are not...supposed to be providing an avenue for the parents to opt-out with these topics of conversation." (Exh. 1 Video Transcr. at 9:50-10:01.) Keppler then avers that one BVSD school does "much more extensive lessons around this topic [than does Fireside Elem.], um but they don't ever they don't communicate to the community because it is just part of the fold and the nature of the the curriculum." (Exh. 1 Video Trans. at 11:29-47.) In other words, the Second Amended Complaint, together with its exhibits, alleges that the curriculum, which is set by the school board, involves health ed. and sex ed. in the form of transgender programming, and that the failure to inform parents of the planned curriculum and of the right to opt out is simply part of what Defendant has directed schools to do.

Citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.* and *Pembaur*, Defendant contends that "[a]n official policy must be 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality]'s officers" and that "[a] 'policy' is a 'course of action

consciously chosen from among various alternatives." (*Motion* at 9-10.) That is precisely what the Amended Complaint and the Second Amended Complaint allege, although *Monell* provides a finer point, stating that municipal liability may attach for constitutional deprivations visited pursuant to governmental custom even though such a custom *has not* received formal approval through the body's official decision-making channels. *Monell*, *supra* (emphasis added). In the video, Keppler strains to maintain that Defendant's transgender curriculum is not an aspect of health ed. or sex ed. but rather falls under Kobus's counseling standards. (Exh. 1 Video Transcr. at 14:06-15:11.) It is apparent that Defendant's aim is to avoid the advance curricular notice and opt-out requirements of the health ed. and sex ed. statutes and in official BVSD policies. The practical effect of this strategy denies parents' religious liberties. (ECF 57-1 ¶¶ 205-208.)

The parent in the video continued pushing for a clear answer. Keppler ultimately admitted that aspects of the transgender programming fall under health and sex ed. (Exh. 1 Video Transcr. at 17:29.) Keppler further stated, "we have reached out to our legal department, and [Keppler has] reached out to also our director who oversees all the counselors. She's in full support of the lessons that are taking place." Keppler adds that "there has not been any concern or question [from the legal department or the director of counselors] with the lessons that have been taught." (Exh. 1 Video Transcr. at 17:34-59.) Keppler further indicates having received "guidance" that Fireside does not need to provide an opt-out and that providing the statutory opt-out is "frowned upon." (Exh. 1 Video Transcr. at 23:56-24:01, 26:29.) When Defendant guides its schools to violate statutory provisions that are expressly designed to protect religious liberties, municipal liability should attach, and it should be held to account. Thus, the Second Amended Complaint reveals that Defendant still directed denials of religious liberties, of the rights of parents to the care and control of their children's upbringing, and of equal protection in its schools as of the March 2021 video.

Keppler further indicates that if a parent disagrees with curriculum, she can file a KEC-R complaint. This demonstrates that not only does Defendant still not offer the opt-out but also that what Defendant does offer (complaint) is less than what is required. Further, Defendant places the burden on parents to discover Defendant's plans and to take steps in response, rather than the other way around as the law provides.

Defendant appears to intentionally misunderstand that the video supports the idea that the acts of which Plaintiffs complain are more than mere anomalies that are disconnected from the events that form the basis for this action. Rather, the customs at issue have survived nearly three years even in the face of litigation about them. This fact militates in favor of the conclusion that Defendant has an enduring policy of trampling religious liberties and flouting Colorado law and written policies in the process. The video shows that BVSD operates with its own customs that come from official policy makers which its employees fully understand and carry out.

### IV.     *A practice of discrimination plausibly alleged.*

Defendant erroneously contends that Plaintiffs point to a single event to support their discrimination claim in order for municipal liability to attach. *Motion* at 9-11. On the contrary, Plaintiffs allege in the Amended Complaint many instances of discrimination, denials of their right to opt out of all health ed. and sex ed., and of retaliation. The Second Amended Complaint includes even more examples. The following is a list of paragraphs in the Second Amended Complaint that allege discriminatory acts—whether religious discrimination, violation of parental rights, violation of equal protection, retaliation, or a combination of these: 10, 12-14, 16, 20, 21, 23, 24, 26, 28, 33, 39-42, 45-50, 52-55, 80, 87, 88, 93-96, 98-101, 120, 127, 128, 134-139, 145, 146, 152-154, 158, 159, 162, 164, 169, 170, 172, 177, 179, 180, 187-193, and 195. (ECF 57-1.) Granted, some of these paragraphs refer to the same events, but over two dozen separate discriminatory acts are

alleged within these paragraphs, and paragraph 192 alone alleges eleven separate discriminatory acts. So, Defendant's contention that only one event occurred is desperately inaccurate.

The video also shows a pattern or custom of conduct by Defendant lasting at least 2.5 years. This demonstrates that Defendant is willfully and knowingly engaged in a time-honored plan that harms religious families, such as Plaintiffs.

### V.     A "final policy maker" caused a constitutional violation.

Defendant employees' emails and video records establish that Plaintiffs have adequately alleged that a final policy maker is responsible for the alleged constitutional violations. Defendant points out that "[w]hether a government official is a 'policy-making official' is 'a question of state law and concerns only 'delegations of legal power.'" (*Motion* at 11 (citations omitted).) Defendant challenges the contention that it is responsible for the acts complained of. A slew of high-level BVSD employees, including Superior Elementary School Principal Bedford, Assistant Superintendent Fernandez, Fireside Elementary School Principal Keppler, and Fireside Elementary School Counselor Kobus point to Defendant school district as the responsible party for decisions, practices, and customs that violated Plaintiffs' rights. Colorado law vests local school boards with control of instruction in the public schools. Colo. Const. art. IX, §15. The Second Amended Complaint points to Colorado's statutory requirements for health ed. (C.R.S. § 22-25-106) and sex ed. (C.R.S. § 22-1-128), including advance, detailed notice of the curriculum and opt-out right.

Because the Colorado Constitution vests local school boards with control of instruction, it is clear that municipal liability should attach to Defendant as a final policy maker. Moreover, because Fireside Principal Keppler and Counselor Kobus repeatedly affirmed that their approach, including that they do not communicate about the transgender curriculum in advance and do not

offer opt outs ("frowned upon") is "part of the curriculum," Defendant, is properly charged with the offenses outlined in the Second Amended Complaint as a final policy maker, and municipal liability should attach.

### VI.     *Plaintiffs plausibly allege Free Exercise Clause violations.*

Defendant maintains that the alleged constitutional violations were not coercive in nature. (*Motion* at 13.) Plaintiffs allege that Defendant has intentionally weaved transgender principles throughout its curriculum. As the Second Amended Complaint state, transgender programming that falls under health ed. and sex ed and therefore requires advance notice and offer of opt out. (ECF 57-1 at ¶¶ 79-84.) Plaintiffs would have opted their children out of all such material, but Defendant concealed the material so that Plaintiffs had no notice of it, let alone the opportunity to opt out. That is not the same as saying that they were not harmed by it, however. Plaintiff children were all elementary aged at the time of the events in question, and they cannot be expected to chronicle all the transgender programming that they received at the hands of Defendant. Suffice to say that by Defendant's admissions, transgender programming is intended to be woven throughout the curriculum. (ECF 57-1 at ¶ 96.) Even aside from the concealed transgender programming, Defendant provided an opt-out for only one of the two performances of Raven's True Self (Nov. 30 but not Nov. 29), provided it late, and never provided an opt-out for planned classroom discussions or videos. In fact, as set forth in the Second Amended Complaint, Defendant, through Bedford, stated that further opt-outs are not available. (ECF 57-1 ¶¶ 20, 40, and 162.)

Defendant revealed its disdain for Plaintiffs' religious beliefs by what appears to have been its deliberate mishandling of their AC-R Complaint (BVSD administrative complaint) and by its "leak" of that confidential complaint to the Boulder Daily Camera in time to attract a crowd of unfriendly objectors to oppose Plaintiffs and their request at the April 2019 school board meeting

that the BVSD school board hear their appeal. All of this is coercive activity that was calculated to subject Plaintiffs to public humiliation and Plaintiff children to a subject from which they would have been exempted by Plaintiff parents had Defendant not circumvented state laws and Plaintiffs' constitutional rights to indoctrinate Plaintiff students without their parents' knowledge or approval. The Second Amended Complaint also points out that because of Defendant's total failure to provide an opt-out for the Nov. 29 presentation of Raven's True Self, and because of Defendant's refusal to offer an opt-out for classroom videos and discussions, the coercion that Plaintiff children must attend those discussions and view any such videos prompted Plaintiff parents to keep their children home from school on both November 29 *and* 30, 2018. Their alternatives were to have their religious beliefs and religious liberties directly assaulted or to do their best to avoid the frontal attack on those days and hope that Defendant would deal well with them in the future. This represented Plaintiffs' response to Defendant's coercion. Defendant cites *Bauchman* (132 F.3d 557) for the proposition that there was no adverse impact on Plaintiff children's academic records. Defendant ignores that they had to be kept home from school to avoid further assault on their religious beliefs. This was adverse academic impact. As the Second Amended Complaint indicates, Plaintiffs endured a stream of offenses because of their religious beliefs, including that their private information was shared with the local newspaper. (ECF 57-1 ¶ 184, 186, 189, and 228-233.) After all, had they complied rather than complained, they would have been treated just as well as all the other families in the District.

### VII.   *Plaintiffs plausibly allege violation of the Fourteenth Amendment right to direct the upbringing and education of their children.*

"Under U.S.C.A. Const.Amend. 14, providing that no state shall deprive any person of liberty without due process of law, 'liberty' denotes, not merely freedom from bodily restraint, but

also the right of the individual to contract to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home, and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390 at 399 (1923). Defendant school district proudly denied Plaintiffs the right to bring up their children and to worship God according to the dictates of their own consciences. As the Amended Complaint and Second Amended Complaint suggest, Defendant believes that if it conceals the information from parents and weaves it through the curriculum, it can avoid detection. This approach is certainly aimed at families like Plaintiffs because those are the families who would opt out on religious grounds.

Defendant also misrepresents Plaintiffs' goals by pointing to *Parents for Privacy v. Barr* (949 F.3d 1210) to state that Plaintiffs cannot direct how a public school teaches their child. As the Amended and Second Amended Complaints make readily apparent, Plaintiffs sought recognition of their religious liberties, parental rights, and equal protection rights, and they hoped not to be retaliated against. Indeed, Plaintiffs sought an opt-out—not direction—of curriculum.

### VIII.   *Plaintiffs plausibly allege Equal Protection Clause violations.*

Public school parents in Colorado are supposed to have the benefit of laws the protect their religious liberties and rights to raise their children according to the dictates of their consciences. Defendant displays its view that it is above the law and can deprive Plaintiffs their rights. It avoids adherence to the law and did so to the detriment of Plaintiffs, which the Second Amended Complaint plainly alleges. (ECF 57-1, generally.) In one sense, Plaintiffs are situated like other BVSD families. But they were not treated that way. Plaintiffs did not benefit from the health ed.

and sex ed. statutes the same way that other BVSD parents did. It is expressly for religious parents like Plaintiffs that advance notice and opt-out requirements exist.

Defendant also characterizes Plaintiffs as being treated like other BVSD parents who are similarly situated simply because Defendant denied the advance notice and opt-outs to everyone. If that approach is permitted, defendant will be able to avoid municipal liability simply by abusing the rights of everyone. It is clearly Plaintiffs and those like them who Defendant's abuses were designed to affect. For, parents who agree with the curriculum do not need the protection of opt-outs for religious reasons. The Second Amended Complaint points out that Defendant's own written policy protects parents' rights to opt out on religious grounds. (ECF 57-15 at 1.) Non-BVSD Colorado public school parents and children enjoy full religious liberties protection and parental rights. Plaintiffs have adequately alleged that they should be just as protected by BVSD policies, state law, and constitutional principles as are other BVSD families.

### IX.     *Plaintiffs plausibly allege that Defendant retaliated for engaging in constitutionally protected activity.*

Plaintiffs allege that Defendant responded to their religious discrimination complaints (AC-R), their supplemental religious discrimination complaint (AC-R supplemental), and their appeal (KE) by retaliating against them. (ECF 57-1.) The Second Amended Complaint outlines retaliation in the form of refusals of advance notice and opt-outs, the refusal to timely respond and to respond fully to Plaintiffs' complaints and appeal, the intentional leak of confidential complaint to the Boulder Daily Camera in such a way as could lead to identification of the minors involved, the use of the leaked confidential complaint to generate an angry crowd at the school board meeting in which the district voted not to even hear Plaintiffs' KE appeal, and Defendant presiding over a school board meeting where numerous community members were permitted to speak, hold signs,

and wear shirts with messages that ranged from name-calling to threats. All of this drove Plaintiffs from the District and caused them great physical and emotional distress. These facts are set forth in detail in the Second Amended Complaint, including in paragraphs 184, 228-233. (ECF 57-1.)

Defendant argues that the allegation that Mr. Barber, BVSD's Chief Communication Officer, shared a confidential copy of Plaintiffs' AC-E2 complaint with a reporter is "not plausible on its face." (*Motion* at 21.) On the contrary, Defendant's disclosures (received after both the filing of the *Motion* and the Second Amended Complaint) reveal not only that this occurred but that it was discussed between Superintendent Rob Anderson, School Board President Tina Marquis, Assistant Superintendent Robbyn Fernandez, and Chief Communication Officer Randy Barber *during* and the morning after a school board meeting at which Plaintiffs testified strongly against BVSD Superintendent Rob Anderson's handling of their AC-R discrimination complaints and KE appeal. (Exh. 2 hereto.) On March 12, 2019 at about 6:35 p.m., adult Plaintiffs testified at a BVSD school board meeting. According to Defendant's disclosures, at 7:02 p.m., CCO Randy Barber emailed Assistant Superintendent Robbyn Fernandez and asked, "Are you in a place where you can provide me the complaints regarding Superior? I got a ruling and need to redact and send to Amy [Bounds of the Boulder Daily Camera]." (*Id*. at 1.) At 7:10, Fernandez emailed Barber saying, "Here is the supplement to the original complaint. Plus a lot of other stuff. You only need the complaint part." (*Id*. at 2.) The next morning at 6:51 a.m., Barber emailed Fernandez to communicate that he had successfully leaked Plaintiffs' complaint and supplemental complaint: "Thanks, Robbyn! I only took the complaint and supplemental complaint, redacted and sent to Amy [Bounds]. Tina [Marquis] and I spoke to her after the Board meeting and she really wasn't interested in the complaint that much. I'll keep you posted." (*Id*. at 3.) These documents, which *Defendant* disclosed not only refute the asserted implausibility of Plaintiff's allegations about these

events, but they also call into question how Defendant can represent to the Court that these allegations are implausible while knowing that they are not only plausible but are actually correct. The statement that Amy Bounds "really wasn't interested in the complaint" suggests that Defendant may have done something to initiate the story that conveniently (for Defendant) was published the day before the school board meeting at which Defendant released its final salvo at Plaintiffs.

Defendant also avers that Plaintiff did not request confidentiality. Yet, Defendant's disclosures reveal the falsehood of this contention in that they contain an email from Plaintiffs to key BVSD actors in which Plaintiffs request that their family's privacy be respected. (Exh. 3.) Plaintiffs also verbally requested confidentiality of their complaints. Defendant's orchestrated leak to the Boulder Daily Camera hardly honors Plaintiffs' request or Defendant's (stated) policy of honoring confidentiality requests.

## CONCLUSION

The Second Amended Complaint alleges that Defendant willfully violated Plaintiffs' religious liberties, parenting rights, and right to equal protection while retaliating against them for deigning to rely upon those legal protections. It demonstrates this while also illustrating that Defendant Boulder Valley School District is responsible for its discriminatory curriculum and the discriminatory customs responsible for the curriculum's implementation in a way that violated Plaintiffs' rights. The perversity of Defendant's customs is clearly spelled out in the Second Amended Complaint. (ECF 57-1.) Defendant enacted a discriminatory curriculum that alienated those with conflicting religious beliefs. Then it denied Plaintiffs—religious people—the lawful opportunity to avoid that curriculum and its abuses. Finally, it retaliated against those people for peacefully complaining about the situation and ran them out of the district. Defendant carried out

14

its plan and even acknowledged that it was doing so knowing that it was violating Plaintiffs' religious beliefs. (ECF 57-4.) The Second Amended Complaint makes all of this patently clear and supports its assertions with specific factual allegations which, despite to Defendant's protestations to the contrary, are all plausibly alleged and legally supportable. Not a whit of the Second Amended Complaint should be dismissed.

Respectfully submitted this 5th day of August, 2021.

ILLUMINE LEGAL, L.L.C.

/S/ J. Brad Bergford
J. Brad Bergford, Esq.
Illumine Legal, L.L.C.
7887 East Belleview Avenue
Suite 1100
Denver, Colorado 80111
Phone (303) 228-2241
Email: brad@lawillumine.com

## CERTIFICATE OF SERVICE

Undersigned hereby certifies that a true and correct copy of the foregoing Response to Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) was filed with the U.S. District Court of Colorado CM/ECF System, which will notify the following attorneys for the Defendant:

Michael W. Schreiner, Esq.
Elliott V. Hood, Esq.
3107 Iris Avenue
Suite 100
Boulder, Colorado 80301
Phone (303) 443-8010
Email: mschreiner@celaw.com
        ehood@celaw.com

/S/ J. Brad Bergford
J. Brad Bergford, Esq.